92 F.3d 157
 UNITED STATES of America
v.
John F. "Duffy" CONLEY; William C. Curtin; Sheila F.
Smith; John Francis "Jack" Conley; Thomas "Bud" McGrath;
Mark A. Abbott; Thomas Rossi; William Steinhart; Roberta
Fleagle; Robin Spratt; Monica C. Kail; William J. Reed;
Joanne T. Smith; Kenneth "Ron" Goodwin; Lawrence N.
"Neudy" Demino, Sr.; Christopher "Chris" Kail; Joseph A.
Devita; Frank Garofalo; Thomas D. Ciocco; Michael Sukaly;
Phillip M. "Mike" Ferrell; Anestos "Naz" Rodites; William E. Rusin,
John F. "Duffy" Conley, Appellant.
 No. 95-3556.
 United States Court of Appeals,
Third Circuit.
 Argued May 6, 1996.
Decided Aug. 1, 1996.
Sur Petition for Rehearing
Aug. 30, 1996.
 
 Linda L. Kelley, Bonnie R. Schlueter, James R. Wilson (argued), William D. Braun, Office of United States Attorney, Pittsburgh, PA, for Appellee.
 Bruce A. Antkowiak (argued), Greensburg, PA, for Appellants.
 Before GREENBERG, ALITO, and MCKEE, Circuit Judges.
 OPINION OF THE COURT
 GREENBERG, Circuit Judge.
 
 
 1
 I. FACTUAL BACKGROUND AND PROCEDURAL HISTORY
 
 A. Factual Background
 
 2
 John F. Conley appeals from a judgment of conviction and sentence entered in this criminal case involving gambling and money laundering on September 29, 1995. This case requires us to determine the constitutionality of section 1B1.2(d) of the United States Sentencing Guidelines. That provision, with its accompanying application note, note 5, requires the sentencing court to determine beyond a reasonable doubt the objects of a multi-object conspiracy after a jury returns a general guilty verdict on the conspiracy charge which does not specify the objectives of the conspiracy. Conley argues that permitting the court to determine the objectives of the conspiracy violates his Sixth Amendment right to jury trial and the Due Process Clause of the Fifth Amendment. In addition, he raises two claims not related to sentencing matters. Because we find section 1B1.2(d) constitutional and reject his other claims, we will affirm.
 
 
 3
 We set forth the facts in the light most favorable to the government as the verdict winner, though we observe that the relevant facts are not contested seriously. United States v. Pungitore, 910 F.2d 1084, 1097 (3rd Cir.1990), cert. denied, 500 U.S. 915, 111 S.Ct. 2009, 114 L.Ed.2d 98 (1991). Conley owned and operated the largest video poker machine gambling business in the Pittsburgh, Pennsylvania, area.[1] At the height of his business, Conley owned thousands of video poker machines in hundreds of businesses throughout western Pennsylvania.[2] During the period covered by the indictment Conley made millions of dollars from this business.
 
 
 4
 Conley operated his gambling business by purchasing video poker machines equipped for gambling and placing them in business establishments with the understanding that they would be used for gambling. The machines had knock-off devices to eliminate points after a payoff and internal accounting mechanisms to allow Conley and the business owners to calculate their profits. Conley persuaded business owners to install his video poker machines by offering to split the gambling proceeds with the owners, supplying start-up money, and promising to provide an attorney and to pay any fines if the owners got into trouble with law enforcement authorities for operating the machines as gambling devices. Conley candidly testified at the trial that his business was a gambling business and all of his video poker machines were used for gambling. His defense was that he operated openly and even obtained municipal licenses for some of the machines. In essence, he regarded his activities as legal.
 
 
 5
 As the gambling business grew, Conley hired employees to solicit new locations, to move and service his video poker machines, and to collect his share of the proceeds from his hundreds of locations. Some of the 22 persons indicted with him were his employees and others were owners or employees of businesses where his video poker machines were used as gambling devices. To facilitate his operations, Conley opened accounts at the Pittsburgh National Bank for the deposits of his gambling proceeds. The scope of Conley's operation is demonstrated by the fact that between 1985 and 1990 he or his employees deposited over $10,000,000 in the accounts, about 93-94% of which was from video poker machine gambling. Conley used the money in these two accounts to promote his gambling business.
 
 
 6
 In addition to soliciting business establishments to become part of his gambling operation, Conley purchased buildings and businesses for use of video poker machines. He either paid salaries or wages to his employees at these locations or compensated them on a percentage basis. Conley collected large sums from his most profitable locations, the most notable one being a snack shop in McKees Rocks, Pennsylvania, called Terry's Snack Shop.
 
 
 7
 Not surprisingly Conley's wide-open gambling business came to the attention of law enforcement authorities. In 1987, the Pittsburgh police arrested Conley for his part in video poker machine gambling at a particular location. Conley was tried in March 1988 in the Court of Common Pleas of Allegheny County on charges arising from this operation and was found guilty of violating the Pennsylvania anti-gambling law, 18 Pa. Con. Stat. Ann. § 5513 (1983). The court sentenced Conley to pay a $1,000 fine and to serve two years on probation.
 
 
 8
 Conley obviously regarded the fine as nothing more than a trivial cost of doing business because he continued his operations. As a result, local, state and federal law enforcement officials began investigating him. These investigations led to searches of his offices and the seizure of hundreds of his video poker machines between 1988 and 1991. A search on September 23, 1988, led to a state grand jury indicting Conley on gambling charges for operating his video poker machine gambling business but the indictment eventually was dismissed.
 
 
 9
 The law enforcement pressure caused Conley and his co-defendants to take measures to thwart the investigatory efforts. Informants would warn Conley of impending law enforcement raids and Conley or one of his employees in turn would warn affected locations so that video poker machines could be removed. Conley instructed others to remove the money contained in his video poker machines, and, on one occasion, all the information in Conley's computer about his video poker machines was "dumped" onto a computer disk which then was hidden in an employee's car.
 
 
 10
 Furthermore, as a result of increasing law enforcement scrutiny, Conley made changes in how he conducted his business. Thus, Conley instructed his employees on a new method to take the readings off video poker machines designed to prevent law enforcement authorities from accessing this information. After law enforcement authorities started their searches, Conley's collectors no longer took the gambling proceeds to Conley's offices but, instead, at Conley's instructions, took the money to other locations or directly to the bank for deposit. Furthermore, Conley's location owners and operators instituted a policy not to make payoffs to persons they did not know. In one instance Conley counseled an employee to be "careful not to pay a cop or a stranger." Conley, who obviously was not lacking in nerve, on one occasion secretly entered a premises in which United States marshals had secured seized video poker machines and removed the knock-off devices from them.
 
 
 11
 The law enforcement pressure caused Conley to reorganize his gambling business to make his involvement less apparent. Following a large number of federal searches, Conley transferred ownership of his video poker machines to three companies he had created. Conley installed an employee as a front owner in each of these companies but he retained effective control over them, and their employees and assets. At the same time, Conley created a company to service the video poker machines transferred to the three newly formed companies. Conley then instructed the nominal owners of the three new vending companies to make monthly payments to the service company from their gambling proceeds. Conley determined the amounts of these payments without regard to the level of services rendered. At the time he created the three new companies, Conley transferred the title to his best gambling location, Terry's Snack Shop, to the woman who ran it for him.
 
 B. Procedural History
 
 12
 The foregoing activities led to a federal grand jury in the Western District of Pennsylvania returning on September 26, 1991, a 29-count indictment charging 23 individuals with participation in an illegal gambling operation involving video poker machines. The indictment identified Conley as the central figure in an extensive illegal video poker machine gambling business and covered the period from 1984 through September 26, 1991.
 
 
 13
 Count one charged Conley and his 22 co-defendants with conspiracy to conduct an illegal gambling business and to launder the proceeds therefrom in violation of 18 U.S.C. § 371. Count two charged Conley and his 22 co-defendants with conducting an illegal gambling business in violation of 18 U.S.C. §§ 1955 and 2. One "part and object" of the conspiracy was that Conley and his co-conspirators conducted an illegal gambling business involving video poker machines "in violation of the laws of the Commonwealth of Pennsylvania" which, in turn, was in violation of 18 U.S.C. § 1955. Count one also charged that a "further" "part and object" of the conspiracy was to engage in money laundering to promote the illegal gambling business in violation of 18 U.S.C. § 1956(a)(1)(A).
 
 
 14
 The conspiracy count charged that "an essential part of the illegal gambling business" involved the division of gambling proceeds with a person at the video poker machine locations, the delivery of Conley's share of the gambling proceeds to certain of his employees, and the deposit of the proceeds into bank accounts Conley controlled. Count one also charged that Conley engaged in money laundering activities with the intent to promote his illegal gambling business and that Conley used illegal gambling proceeds to promote his illegal gambling business by purchasing more video poker machines, paying his employees, and depositing the proceeds in the bank. In addition, the overt acts of the conspiracy to launder money included numerous payments to Conley's video poker machine service company. The remaining 27 counts of the indictment charged certain of the defendants with interstate travel to carry on an unlawful activity in violation of 18 U.S.C. § 1952(a)(3), interstate transportation of gambling devices in violation of 15 U.S.C. §§ 1172 and 1176, and money laundering in violation of 18 U.S.C. § 1956.
 
 
 15
 The proceedings after the indictment was returned were complex. Over the next three years, the district court issued numerous published opinions on scores of motions and we have issued two published opinions in this case. United States v. Conley, 37 F.3d 970 (3d Cir.1994); United States v. Conley, 4 F.3d 1200 (3d Cir.1993), cert. denied, 510 U.S. 1177, 114 S.Ct. 1218, 127 L.Ed.2d 564 (1994).[3] Two of the district court's opinions are particularly significant. In United States v. Conley, 859 F.Supp. 909 (W.D.Pa.1994), the district court rejected Conley's motions to dismiss the indictment on the grounds that video poker is de facto legal, he was prosecuted selectively, and the government engaged in misleading conduct ("entrapment by estoppel") thereby violating his due process rights. However, in another order the court dismissed certain money laundering counts on the ground that they were duplicitous. United States v. Conley, 826 F.Supp. 1536 (W.D.Pa.1993).
 
 
 16
 Following that dismissal, on August 4, 1994, a grand jury in the Western District of Pennsylvania returned a 15-count indictment charging Conley with money laundering in violation of 18 U.S.C. §§ 1956(a)(1)(A) and 2. These new counts reasserted the charges in the dismissed money laundering counts. On November 22, 1994, the district court consolidated the two indictments for trial. Conley was the only defendant to be tried because the others all pleaded guilty to a violation of 18 U.S.C. § 371 or 18 U.S.C. § 1955. Conley's first trial ended in a mistrial. His second trial began on April 25, 1995, and concluded on June 23, 1995, with the jury finding him guilty on counts one and two of the original indictment charging him with conspiracy in violation of 18 U.S.C. § 371 and with conducting an illegal gambling business in violation of 18 U.S.C. §§ 1955 and 2. The jury was unable to reach a verdict on the 15 money laundering counts in the second indictment and the court declared a mistrial as to them.
 
 
 17
 On July 14, 1995, the district court made tentative findings of fact for sentencing purposes pursuant to U.S.S.G. § 1B1.2(d). Employing a "beyond a reasonable doubt standard," as required by application note 5 to section 1.B1.2(d), the court found that Conley and his co-conspirators "adhered to and/or conspired to commit both of the objects alleged in Count one" of the original indictment, that is, "they conspired to conduct an illegal gambling business and to launder the proceeds thereof."[4] The court reached the second conclusion notwithstanding the jury's inability to return a verdict on the money laundering charges contained in the second indictment. Then on September 28, 1995, the district court made supplemental tentative findings and rulings.
 
 
 18
 Ultimately the court determined Conley's sentence as follows. The court started with the sentencing guideline for violation of 18 U.S.C. § 371 found at U.S.S.G § 2X1.1, which provides that the base offense level is determined by the substantive offense which is the object of the conspiracy. Since the court already had applied U.S.S.G. § 1B1.2(d) and found that Conley conspired to operate an illegal gambling business and to launder its proceeds, the court grouped the two offenses pursuant to U.S.S.G. § 3D1.2(b). Under U.S.S.G. § 3D1.3(a), in the case of grouped counts, the offense level is determined by the most serious of the counts comprising the group. Since the base offense level for money laundering under U.S.S.G. § 2S1.1 is greater than that for conducting an illegal gambling business under U.S.S.G. § 2E3.1, the court used the base offense level of 23 contained in U.S.S.G. § 2S1.1. The court found that Conley had conspired to launder in excess of $10,000,000. Accordingly, the district court increased the base offense level under U.S.S.G. § 2S1.1(b)(2) by 9 levels to 32. The court found that Conley was the leader of the conspiracy and, as a result, the court increased the offense level by 4 levels under U.S.S.G. § 3B1.1(a) to 36.
 
 
 19
 The court also found that Conley's "conduct in testifying falsely at pretrial hearings, directing others to destroy or conceal evidence, opening video poker machines after they had been seized by the U.S. Marshals and throwing papers into his fireplace when federal agents were at his door is sufficient evidence of obstruction to warrant an enhancement in the base offense level." As a result, the court increased the offense level another 2 levels under U.S.S.G. § 3C1.1 to 38. With a total offense level of 38 and a criminal history category I, Conley's sentencing range was 235 to 293 months.
 
 
 20
 On September 29, 1995, the court sentenced Conley to 60 months imprisonment on count one and 60 months imprisonment on count two, the maximum sentences allowed by 18 U.S.C. §§ 371 and 1955. Since the maximum sentences permitted under the statutes were not equal to the guideline range, the court directed that Conley serve the sentences consecutively pursuant to U.S.S.G. § 5G1.2(d). The court also imposed a $1,000,000 fine. Conley then appealed.
 
 
 21
 The district court denied Conley bail pending appeal based on its finding "by clear and convincing evidence that [Conley], contrary to the conditions of his bail, continued to engage in illegal gambling in the operation of his business involving video poker machines subsequent to the indictment period and subsequent to his conviction on Counts 1 and 2 of the indictment at Criminal No. 91-178." In addition, the district court found that Conley grossed at least $4,320,000 after his indictment through the continuation of his illegal conduct and that Conley committed perjury by filing false affidavits representing that he was not involved in any gambling activity.
 
 II. DISCUSSION
 
 22
 Conley claims that his sentence violates the Fifth and Sixth Amendments, that the district court improperly limited his scope of cross-examination of government witnesses, and that it improperly admitted evidence seized in violation of the Fourth Amendment. While ordinarily we would address the evidence and search and seizure issues before the sentencing issues, we will invert that order as Conley addressed the sentencing issues first in his brief and they require more discussion than the other issues.
 
 A. Constitutionality of the Sentence
 
 23
 Conley argues that his sentence violates the Due Process Clause of the Fifth Amendment and his Sixth Amendment right to a jury trial. The jury convicted him of a single count of conspiracy under 18 U.S.C. § 371 that as charged included as objects (1) violation of the gambling laws and (2) money laundering. Conley argues that since the jury did not specify the object of the conspiracy for which it convicted him it is unconstitutional to sentence him under the money laundering guidelines because they are more severe than the gambling guidelines, especially since he was not convicted of the underlying substantive money laundering counts.
 
 
 24
 It is clear that when a jury returns a general verdict of guilty on a multi-object conspiracy count, the conviction will stand over Fifth Amendment due process objections so long as there is sufficient evidence to support any one of the objects of the conspiracy. Thus, the Supreme Court has said: " '[W]hen a jury returns a guilty verdict on an indictment charging several acts in the conjunctive, as [defendant]'s indictment did, the verdict stands if the evidence is sufficient with respect to any one of the acts charged.' " Griffin v. United States, 502 U.S. 46, 56-57, 112 S.Ct. 466, 473, 116 L.Ed.2d 371 (1991) (quoting Turner v. United States, 396 U.S. 398, 420, 90 S.Ct. 642, 654, 24 L.Ed.2d 610 (1970)).[5] Nevertheless if any of the legal theories submitted to the jury was unconstitutional a general verdict of guilty cannot stand. Bachellar v. Maryland, 397 U.S. 564, 570-71, 90 S.Ct. 1312, 1315-16, 25 L.Ed.2d 570 (1970); see also Griffin, 502 U.S. at 55, 112 S.Ct. at 472 (listing numerous cases for this proposition).
 
 
 25
 Most courts also have held that the punishment imposed after a general jury verdict of guilty in a multi-object conspiracy cannot exceed the shortest maximum penalty authorized in the statutes criminalizing the multiple objects if the punishment authorized by the conspiracy statute depends on the punishment provided for the substantive offense or offenses which were the object or objects of the conspiracy. United States v. Orozco-Prada, 732 F.2d 1076, 1083-84 (2d Cir.), cert. denied, 469 U.S. 845, 105 S.Ct. 154, 83 L.Ed.2d 92 (1984); United States v. Quicksey, 525 F.2d 337, 340-41 (4th Cir.1975) (Defendants were charged and convicted in single count in a narcotics case under both the narcotics conspiracy statute, 21 U.S.C. § 846, and the general conspiracy statute, 18 U.S.C. § 371. The court held that "in the absence of a special verdict, it is not possible to ascertain whether the jury intended to find the defendants guilty of conspiracy to violate the Travel Act or the Drug Act, or both Acts," and therefore the government must agree to resentencing under the shorter general conspiracy provision or court would remand for new trial.), cert. denied, 423 U.S. 1087, 96 S.Ct. 878, 47 L.Ed.2d 97 (1976); United States v. Fisher, 22 F.3d 574, 576 (5th Cir.) ("[W]e recognize[ ] that punishment for conviction of a multiple object conspiracy may not exceed the statutory maximum for the offense carrying the least severe penalty."), cert. denied, 513 U.S. 1008, 115 S.Ct. 529, 130 L.Ed.2d 433 (1994); United States v. Garcia, 37 F.3d 1359, 1370 (9th Cir.1994) ("The sentencing court cannot speculate as to which object of the conspiracy the jury found to support the conviction. To do so would invade the province of the jury."; rejecting government's argument that jury's finding of guilty on the underlying offense permits inference that jury convicted defendant on basis of more serious object), cert. denied, --- U.S. ----, 115 S.Ct. 1699, 131 L.Ed.2d 562 (1995); United States v. Owens, 904 F.2d 411, 414-15 (8th Cir.1990) (verdict unclear as to whether methamphetamine or amphetamine was object of drug conspiracy could not support higher sentence based on methamphetamine); Newman v. United States, 817 F.2d 635, 637-39 (10th Cir.1987); Brown v. United States, 299 F.2d 438 (D.C.Cir.), cert. denied, 370 U.S. 946, 82 S.Ct. 1593, 8 L.Ed.2d 812 (1962).[6]
 
 
 26
 In two cases, however, courts of appeals have upheld sentences exceeding the statutory maximum for the least severely punished substantive offense charged as an object of the conspiracy in a multi-object conspiracy case. In United States v. Peters, 617 F.2d 503 (7th Cir.1980) (per curiam), the court held a multi-object conspiracy conviction without a special verdict could support a 15-year sentence even though the sentence was longer than several of the sentences statutorily provided for the predicate offenses. But in Peters the jury also convicted the defendant of substantive drug offenses carrying 15-year sentences.[7] In United States v. Dennis, 786 F.2d 1029 (11th Cir.), modified on other grounds on rehearing, 804 F.2d 1208 (11th Cir.1986), cert. denied, 481 U.S. 1037, 107 S.Ct. 1973, 95 L.Ed.2d 814 (1987), the court affirmed a conspiracy sentence that exceeded the statutory maximum for conviction of one of the underlying statutes, but only because there was no question as to the basis of the jury's finding. Ordinarily, it said, a special verdict would be necessary because:
 
 
 27
 [Absent a special verdict], the reviewing court ... may not examine the evidence presented at trial to determine whether the jury, if properly instructed, could have or even should have found [the more severe basis for the conspiracy]; rather the court's inquiry is confined to determining beyond any reasonable doubt whether the jury did find such a conspiracy and whether it intended the verdict it returned to reflect that determination. Only in that manner may we avoid invading the special province of the jury in a criminal case both to find the facts and apply the law as it sees fit. Thus the prosecution's interest in obtaining a jury verdict that will be construed to reflect a finding [that the defendant's object in the conspiracy was the more severely punished object] can only be frustrated where the government opposes a defense request for a special verdict in a case involving a conspiracy charge similar to the one at issue here.
 
 
 28
 Id. at 1041.
 
 
 29
 Here, the district court's finding that Conley had conspired to commit both objects specified in the conspiracy charged in count one resulted in a base offense level of 32. This finding was significant because if the district court found that Conley conspired only to engage in an illegal gambling business, the base offense level would have been 12. The court, however, sentenced Conley under 18 U.S.C. § 371, the general conspiracy statute, which provides, with an inapplicable misdemeanor exception, a maximum sentence of five years, regardless of the maximum sentence authorized for violation of the law which the defendant conspired to violate.
 
 
 30
 Since the maximum sentence for conspiracy in this case does not depend upon the penalties authorized for the underlying substantive offenses, Conley's statutory maximum sentence on this count, as distinguished from the maximum sentence under the guidelines, does not depend upon whether the jury found him guilty of either or both objects of the conspiracy. The sentence, therefore, does not run afoul of the proposition that the district court must sentence in accordance with the least severe predicate offense statute when the jury returns a general verdict of guilty in a multi-object conspiracy. Thus, the line of cases cited above--multi-object conspiracy cases with defendants sentenced pursuant to penalty provisions dependent on substantive law--is distinguishable.
 
 
 31
 Conley argues, however, that the rule requiring use of the penalties for the least onerous predicate offense in sentencing after general guilty verdicts in multi-object conspiracy cases should apply to calculations under the sentencing guidelines. There is support for this position. The Court of Appeals for the Tenth Circuit in United States v. Pace, 981 F.2d 1123, 1128-30 (10th Cir.1992), cert. denied, 507 U.S. 966, 113 S.Ct. 1401, 122 L.Ed.2d 774 (1993), held that if a jury returns a general verdict which does not specify the object of a conspiracy, the defendant must be sentenced under the sentencing guidelines on the basis of the objective yielding the lowest offense level. See also United States v. Bush, 70 F.3d 557, 561 (10th Cir.1995), cert. denied, --- U.S. ----, 116 S.Ct. 795, 133 L.Ed.2d 743 (1996). Similarly, the Court of Appeals for the Eighth Circuit, in another guidelines case, has held that a district court must calculate the sentence on the basis of the least severely punished object after a general verdict of guilty in a multi-object conspiracy case. United States v. Owens, 904 F.2d 411 (8th Cir.1990). The court explained:
 
 
 32
 Because the establishment of Owen's base offense level required a determination of which drug the conspiracy involved, and because the Sentencing Guidelines provide disparate sentencing ranges for amphetamine and methamphetamine, the district court should have used a special verdict form to permit the jury to indicate which substance it found to be the object of the conspiracy.
 
 
 33
 . . . . .
 
 
 34
 [B]y failing to enable the jury to indicate which of the substances it found the conspiracy to have involved, the district court elicited an ambiguous verdict of guilty with two possible alternative interpretations. Under the circumstances of this case, the district court erred in sentencing Owens based on the alternative which yielded a higher sentencing range.
 
 
 35
 Id. at 415. Drawing on these cases, Conley claims that sentencing him under section 1B1.2(d) on the basis of a verdict which does not designate the object of the conspiracy for which the jury convicted him violates his Sixth Amendment right to a jury trial.
 
 
 36
 We start our analysis of this Sixth Amendment argument with McMillan v. Pennsylvania, 477 U.S. 79, 106 S.Ct. 2411, 91 L.Ed.2d 67 (1986). There the Supreme Court permitted a state to treat conduct which arguably was an element of a criminal offense, the visible possession of a weapon during certain offenses, as a sentencing factor. As a result, the trial court rather than the jury would determine whether the sentencing factor was present and would do so by the preponderance of the evidence. The Court in reaching its result explained:
 
 
 37
 While 'there are obviously constitutional limits beyond which the States may not go in this regard,' ibid., '[t]he applicability of the reasonable-doubt standard ... has always been dependent on how a State defines the offense that is charged in any given case.'
 
 
 38
 Id. at 83-85, 106 S.Ct. at 2415 (quoting Patterson v. New York, 432 U.S. 197, 211 n. 12, 97 S.Ct. 2319, 2327 n. 12, 53 L.Ed.2d 281 (1977)). The Court analyzed the Sixth Amendment claim tersely:Having concluded that Pennsylvania may properly treat visible possession as a sentencing consideration and not an element of any offense, we need only note that there is no Sixth Amendment right to jury sentencing, even where the sentence turns on specific findings of fact.
 
 
 39
 Id. at 92, 106 S.Ct. at 2419 (citing Spaziano v. Florida, 468 U.S. 447, 459, 104 S.Ct. 3154, 3161, 82 L.Ed.2d 340 (1984)).
 
 
 40
 It is clear from McMillan, that if section 1B1.2(d) is, in the words of McMillan, properly a "sentencing consideration," then the section does not infringe the Sixth Amendment right to jury trial. The Chief Justice's concurring opinion in United States v. Gaudin, 515 U.S. 506, ----, 115 S.Ct. 2310, 2321, 132 L.Ed.2d 444 (1995), is in harmony with McMillan. There the Chief Justice noted that:
 
 
 41
 Nothing in the Court's decision stands as a barrier to legislatures that wish to define--or that have defined--the elements of their criminal laws in such a way as to remove issues such as materiality from the jury's consideration. We have noted that the definition of the elements of a criminal offense is entrusted to the legislature, particularly in the case of federal crimes which are solely creatures of statute.
 
 
 42
 Id. (Rehnquist, C.J., concurring) (internal quotation marks omitted). We must decide, therefore, whether the determination of the object of a multi-object conspiracy following a general verdict of guilty properly can be deemed the ascertaining of a sentencing consideration or whether such a determination is beyond the "constitutional limits" referred to in McMillan, 477 U.S. at 85, 106 S.Ct. at 2415, and Patterson v. New York, 432 U.S. 197, 210, 97 S.Ct. 2319, 2327, 53 L.Ed.2d 281 (1977).
 
 
 43
 This issue is controlled by the Court's holding in Griffin v. United States, 502 U.S. 46, 112 S.Ct. 466, 116 L.Ed.2d 371, where the Court rejected the due process argument that a general verdict of guilty in a multi-object conspiracy verdict could not stand if the evidence to support a conviction for conspiracy to commit one of the objects was insufficient. The Court reached that result notwithstanding its almost contemporaneous holding in Sullivan v. Louisiana that the prosecution "must persuade the factfinder 'beyond a reasonable doubt' of the facts necessary to establish each of [the] elements" of the crime. 508 U.S. 275, 278, 113 S.Ct. 2078, 2080, 124 L.Ed.2d 182 (1993). As the Court explained in Sullivan, "the jury verdict required by the Sixth Amendment is a jury verdict of guilty beyond a reasonable doubt." Id. at 278, 113 S.Ct. at 2081.
 
 
 44
 If, as Conley asserts, it were constitutionally impermissible to treat the object of a multi-object conspiracy indictment as a sentencing factor rather than as an element of the crime, then it is difficult to understand how the Griffin Court, consistently with Sullivan, could have permitted a conspiracy conviction to stand when there was insufficient evidence to support a conviction for one of the objects. After all, if each object of the conspiracy had been an element of the crime then under well-established law the defendant in Griffin would have been entitled to an acquittal since the proofs could not support the charge that she conspired with respect to one object. Thus, while Conley argues that violation of each object of the conspiracy must be considered a separate element of the offense for the purposes of his Sixth Amendment right to a jury trial, it is clear from Griffin that making the object of a conspiracy charged under 18 U.S.C. § 371 a matter for the sentencer rather than an element of the crime does not violate the Sixth Amendment.[8]
 
 
 45
 Our result finds support in United States v. Martinez, 924 F.2d 209 (11th Cir.), cert. denied, 502 U.S. 870, 112 S.Ct. 203, 116 L.Ed.2d 163 (1991), in which the Court of Appeals for the Eleventh Circuit described the distinction between the constitutional uses of the guidelines and the statutes:
 
 
 46
 [Equating the constitutional limitations on their use] misperceives the distinction between a sentence and a sentence enhancement. Although both the separate sentence under § 924(c) and the sentence enhancement under Guidelines § 2D1.1(b)(1) result in an increased penalty, only a conviction and sentence under § 924(c) requires the full panoply of constitutional safeguards ordinarily granted criminal defendants.
 
 
 47
 . . . . .
 
 
 48
 Because the Guidelines did not alter the maximum sentence for the offense for which appellant was convicted but merely limited the sentencing court's discretion in selecting a penalty within the permissible range, there is no constitutional violation in permitting the district court to consider relevant conduct for which the defendant was neither charged nor convicted, so long as proof of that conduct is supported by reasonable indicia of reliability.
 
 
 49
 Id. at 211 (internal quotations and citations omitted).
 
 
 50
 We also note that decisions of other courts of appeals are consistent with our conclusions. See United States v. Dale, 991 F.2d 819, 854-55 (D.C.Cir.1993) (affirming guidelines calculation after general guilty verdict on multi-count conspiracy indictment after jury conviction on underlying substantive offense), cert. denied, 510 U.S. 906, 114 S.Ct. 286, 126 L.Ed.2d 236 (1993); United States v. Linn, 31 F.3d 987, 995 (10th Cir.1994) (affirming guideline calculation based on general guilty verdict on multi-count conspiracy indictment when jury instructions phrased in conjunctive rather than disjunctive ); United States v. Wessels, 12 F.3d 746, 754 (8th Cir.1993) (where type of methamphetamine involved in crime would affect guideline sentence, and jury verdict ambiguous on this point, remanding to district court for determination of type of methamphetamine involved; no new jury trial required), cert. denied, 513 U.S. 831, 115 S.Ct. 105, 130 L.Ed.2d 53 (1994). Consequently, we reiterate that permitting the court to determine for sentencing guideline purposes the objects of a conspiracy charged in an indictment under 18 U.S.C. § 371 if the jury finds the defendant guilty in a general verdict does not violate the Sixth Amendment and therefore section 1B1.2(d) itself does not violate that amendment.
 
 
 51
 Finally on the Sixth Amendment issue we point out that our result is in harmony with our jurisprudence under the sentencing guidelines from the time of our earliest guidelines opinions. See United States v. Ryan, 866 F.2d 604 (3d Cir.1989). In Ryan the defendant was charged with possession of a controlled substance, crack, with intent to distribute. The jury acquitted him on that charge but convicted him of the lesser included offense of simple possession of a controlled substance. At sentencing the district court departed upwards from the applicable guideline range on the basis of factors which indicated that the defendant possessed the crack with the intent to distribute. Ryan appealed, contending that "in effect, he was sentenced for a crime for which he had been acquitted." Id. at 606. We rejected his contention, pointing out that the guidelines allowed the sentencing court to take into consideration conduct that neither was formally charged nor was an element of the offense of conviction, id. at 608 n. 9, and that "[b]efore the guidelines were promulgated, a court was permitted to consider evidence on counts of which a defendant was acquitted in sentencing the defendants." Id. at 609. We have adhered to the Ryan approach and we note that many other courts have reached the same result as Ryan. See, e.g., United States v. Frierson, 945 F.2d 650, 653-54 (3d Cir.1991), cert. denied, 503 U.S. 952, 112 S.Ct. 1515, 117 L.Ed.2d 651 (1992); United States v. Foster, 19 F.3d 1452, 1454-55 (D.C.Cir.1994); United States v. Rodriguez-Gonzalez, 899 F.2d 177, 180-81 (2d Cir.), cert. denied, 498 U.S. 844, 111 S.Ct. 127, 112 L.Ed.2d 95 (1990).
 
 
 52
 Ryan, of course, differs from this case as it dealt with a departure whereas here we are concerned with the establishment of the guideline range. But still Ryan is persuasive here for in this case, as in Ryan, the district court made a determination predicated on its conclusions as to the conduct in which the defendant engaged at the time of the offense, even though the verdict did not support the conclusion. Indeed, in two respects Conley's argument is weaker than that of the defendant in Ryan because in Ryan the jury acquitted the defendant of the distribution offense. In this case, for all we know, the jury might have concluded that Conley was guilty on the conspiracy money laundering charge or may have not reached a conclusion on the point. Furthermore, here, unlike in Ryan, the court made the determination that the defendant engaged in the conduct on which the sentence depended beyond a reasonable doubt.[9] Ryan is further significant on an additional argument that Conley advances, i.e., that the court should have submitted a special verdict form to the jury to determine the object of the conspiracy if the jury convicted him on the conspiracy count. The court did not err in refusing to submit the special verdict form. Under Griffin the special verdict form was not required for the jury to return a valid guilty verdict nor was it necessary for the district court or this court to review the sufficiency of the evidence to support the verdict. Ryan makes clear that even after a not guilty verdict the district court may consider the conduct of which the defendant was acquitted in imposing sentence. While if the court submits to the jury the task of determining the object of the conspiracy, it may be bound by section 1B1.2 by the jury's conclusion, still we see no reason why the court cannot decline in a conspiracy case under 18 U.S.C. § 371 to use a special verdict form and instead reserve the determinations germane to sentencing to itself.
 
 
 53
 As we have indicated, Conley also argues that his sentence violates the Due Process Clause of the Fifth Amendment because of the district court's power to make the crucial finding that an object of the conspiracy was money laundering. Here we are guided by the Court's holding in McMillan. There the Court considered a Pennsylvania statute which subjected defendants convicted of certain felonies to a mandatory minimum sentence of five years imprisonment if the sentencing judge found, by a preponderance of the evidence, that the person "visibly possessed a firearm" during the commission of the offense. The Court found that the preponderance of the evidence standard was constitutional but explained that "in certain limited circumstances Winship 's reasonable-doubt requirement applies to facts not formally identified as elements of the offense charged." McMillan, 477 U.S. at 86, 106 S.Ct. at 2416 (citing In re Winship, 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970)). The Court refused to draw a bright line but observed that the Pennsylvania statute "gives no impression of having been tailored to permit the visible possession finding to be a tail which wags the dog of the substantive offense." Id. at 88, 106 S.Ct. at 2417.
 
 
 54
 We also are informed on the due process issue by United States v. Kikumura, 918 F.2d 1084 (3d Cir.1990). There we found that a determination during sentencing that increased the defendant's sentence from about 30 months to 30 years, the equivalent of a 22-level increase in his offense level, constituted a "tail which wags the dog of the substantive offense." Id. at 1100-01. Consequently, we required that facts found at such an important sentencing hearing be established by "clear and convincing evidence" rather than simply by a preponderance of the evidence. Id. at 1103.
 
 
 55
 In this case, Conley's sentence exposure was increased from a base offense level of 12 to 32 as a result of the finding by the district court that money laundering was an object of the conspiracy. Since the court made this finding under the "beyond a reasonable doubt" standard, we have no need to determine whether we could uphold the 20-level increase on the basis of a finding meeting a less exacting standard. By determining the objects of the conspiracy beyond a reasonable doubt, the sentencing court met whatever procedural standard which might have been required.[10] Thus, section 1B1.2(d), which with application note 5 requires the use of the beyond a reasonable doubt standard, does not violate the Fifth Amendment.
 
 
 56
 In his reply brief, Conley relies heavily on United States v. Schramm, 75 F.3d 156 (3d Cir.1996), to support his due process contentions. In Schramm the appellant was convicted for a conspiracy violation under 18 U.S.C. § 371 and the jury determined the object of the conspiracy on a special verdict form. The evidence presented, however, did not support a conviction for a conspiracy to commit that particular object. The district court upheld the verdict by a broad interpretation of the object as charged in the indictment so that the proofs were adequate. We reversed on the ground that the court's interpretation of the object was not consistent with the indictment. In the course of our opinion we pointed out that "the illegal object of the conspiracy is an essential element of the offense and must be included in the indictment," and "[t]he goal or goals of the agreement are, therefore, essential elements of the crime of conspiracy itself." Id. at 163.
 
 
 57
 Schramm is entirely consistent with our result. Here we are not concerned with a situation in which an indictment alleged one offense and the government proved the defendant committed another offense. The evidence against Conley clearly was sufficient to support the verdict of guilty on the conspiracy charge; Conley does not even argue that we should enter a judgment of not guilty.
 
 
 58
 Conley also claims that the district court erred in finding that he conspired to launder money. We will not set aside fact-finding by the district court unless it is clearly erroneous. United States v. Katora, 981 F.2d 1398, 1401 (3d Cir.1992). We do not find that the district court's determination beyond a reasonable doubt that Conley was guilty of conspiracy to launder money was clearly erroneous. Indeed, it is difficult to understand how the proofs could not be deemed to support money laundering as that term is expansively defined in 18 U.S.C. § 1956(a)(1)(A).[11] We emphasize that the district court's determination of the object of the conspiracy is wholly independent of the jury's determination of the object of the conspiracy.
 
 B. Limitations of Cross-Examination
 
 59
 Conley also claims that the district court erred in limiting the cross-examination of government witnesses regarding information necessary to his claim that he lacked the knowledge sufficient to find him guilty of the money laundering statute. Rule 611(b) of the Federal Rules of Evidence provides:
 
 
 60
 Scope of Cross-examination. Cross-examination should be limited to the subject matter of the direct examination and matters affecting the credibility of the witness. The court may, in the exercise of discretion, permit inquiry into additional matters as if on direct examination.
 
 
 61
 Id. "This court has given district courts wide discretion in limiting cross-examination." United States v. Casoni, 950 F.2d 893, 918 (3d Cir.1991). "A restriction will not constitute reversible error unless it is so severe as to constitute a denial of the defendant's right to confront witnesses against him and it is prejudicial to substantial rights of the defendant." Id. at 917-18 (quoting United States v. Adams, 759 F.2d 1099, 1110 (3d Cir.), cert. denied, 474 U.S. 906, 106 S.Ct. 275, 88 L.Ed.2d 236 (1985)). The Supreme Court has explained that the Confrontation Clause requires only "an opportunity for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." Delaware v. Van Arsdall, 475 U.S. 673, 679, 106 S.Ct. 1431, 1435, 89 L.Ed.2d 674 (1986) (internal quotation marks omitted).
 
 
 62
 In particular, Conley objects to the district court's limitation on his cross-examination of government witnesses about the nature and scope of the vending machine business, permits issued by local municipalities for the machines, and the existence of other vendors operating in a similar fashion. In its memorandum opinion of April 17, 1995, the district court granted the government's motion to limit cross-examination. It explained:
 
 
 63
 In a previous memorandum opinion in this case, United States v. Conley, 859 F.Supp. 909 (W.D.Pa.1994), this Court squarely rejected the 'affirmative defenses' of reliance on misleading government conduct (or entrapment by estoppel), selective prosecution and de facto legality, holding that, whatever merit these defense may have in the abstract or the right circumstances, the Conley defendants had proffered nothing to warrant presentation of these defenses to the jury.
 
 
 64
 . . . . .
 
 
 65
 [D]efendant will be entitled to present evidence as to the intent and knowledge elements of the crimes charged to the extent his proffered evidence is relevant to his state of mind at the time of the offenses. Defendant will be permitted to elicit such evidence only during his defense, but not during cross examination of the government witnesses, unless he first makes a convincing proffer outside of the presence of the jury and obtains the Court's permission to go beyond the scope of the subject matter of the direct examination of any given witness.
 
 
 66
 The district court's limitation of Conley's cross-examination to the matters raised on direct pursuant to Rule 611(b) was entirely justified and certainly does not rise to an abuse of the district court's discretion.
 
 C. Fourth Amendment Claim
 
 67
 Finally, Conley argues that the district court erred in admitting evidence that he claims was obtained in violation of the Fourth Amendment when state police officers failed to knock and announce their presence and authority in executing a search warrant of 930 Saw Mill Run Boulevard in Pittsburgh. He contends that the Supreme Court's recent opinion, Wilson v. Arkansas, 514 U.S. 927, 115 S.Ct. 1914, 131 L.Ed.2d 976 (1995), lends support to his position.
 
 
 68
 We set out the facts at length as found by the district court on the point. The district court found that 930 Saw Mill Run Boulevard was a two-story, brown-brick building located in a strip of commercial properties. The words "Conley Motor Freight" were painted on the outside of the building. The building had two entrances, one facing the street and another in the rear of the building. Persons seeking to enter were directed by a sign to the back entrance. Inside the back doors was a storage room, and beyond the storage room a doorway leading to the first-floor office space. Another defendant in this case, Jack Conley, Conley's father, maintained a desk in the office, situated to afford him a view of persons entering and exiting the Saw Mill premises.
 
 
 69
 On September 23, 1988, after Detective Bosetti secured a search warrant for the 930 Saw Mill Run premises, he, Detective Quinlan, and a uniformed police officer parked in front of 930 Saw Mill Run. While walking along the side of the building to the back, the officers were able to see Jack Conley and an office in operation behind him. At the same time, Jack Conley saw the uniformed officer and the two detectives. The storm door in the back was closed but unlocked. The inner door was open. Without knocking or otherwise announcing their presence, the officers entered the storage room and walked through the storage room and into the first-floor office area where they identified themselves as police officers and announced that they were there to serve a search warrant. United States v. Conley, 856 F.Supp. 1010, 1028-30 (W.D.Pa.1994).
 
 
 70
 In an unpublished memorandum opinion, we rejected a similar claim involving the same entry and search by co-defendant Sheila Smith, who was appealing from an order denying her post-conviction motion under 28 U.S.C. § 2255 to withdraw her guilty plea. United States v. Smith, No. 95-3391, 70 F.3d 1258 (3d Cir. Oct. 24, 1995). There we found that the search was reasonable because the officers entered during daylight and during business hours, the officers entered through an unlocked door, an occupant witnessed the officers approach, the officers announced their presence soon after entry, the entry occurred at a commercial establishment, and the officers were executing a valid warrant. Conley argues that we should reconsider our decision in Smith because there was no purported law enforcement justification for the officers' failure to knock and announce their presence and because the distinction between residential and commercial facility should not justify an illegal search.
 
 
 71
 In Wilson the Court held that "[c]ontrary to the decision below, ... in some circumstances an officer's unannounced entry into a home might be unreasonable under the Fourth Amendment." Id. at ----, 115 S.Ct. at 1918.
 
 
 72
 But as we explained in Smith,
 
 
 73
 Wilson did not establish a per se rule that the failure to knock and announce results in evidentiary exclusion.... The Wilson Court left to lower courts 'the task of determining the circumstances under which an unannounced entry is reasonable under the Fourth Amendment.'
 
 
 74
 Slip op. at 7 (citation omitted).
 
 
 75
 Here the district court found that Conley saw the officers as they approached the back of the building, and that they entered an unlocked door leading to a storage room during daylight hours. When they entered the storage room they announced their presence and the reason they had come. Conley, 856 F.Supp. at 1028-30. The court also found that the officers did not execute the warrant in a provocative manner likely to lead to violence. In Smith, in upholding the search, we indicated that "[a] thoughtful consideration of all these factors led the district court to find that the search ... was reasonable under the Fourth Amendment, despite the officers' failure to knock on the outer door and announce their presence before entering." Smith, slip op. at 8. After considering the record, we independently reach the same result as the Smith panel and conclude that the district court properly found that the search was reasonable.
 
 III. CONCLUSION
 
 76
 For the foregoing reasons we will affirm the judgment of conviction and sentence entered September 29, 1995.
 
 
 77
 Before SLOVITER, Chief Judge, and BECKER, STAPLETON, MANSMANN, GREENBERG, SCIRICA, COWEN, NYGAARD, ALITO, ROTH, LEWIS, and McKEE, Circuit Judges.
 
 SUR PETITION FOR REHEARING
 Aug. 30, 1996
 
 78
 The petition for rehearing filed by the appellant, John F. "Duffy" Conley, in the above captioned matter having been submitted to the judges who participated in the decision of this court and to all the other available circuit judges of the court in regular active service, and no judge who concurred in the decision having asked for rehearing, and a majority of the circuit judges of the circuit in regular active service not having voted for rehearing by the court in banc, the petition for rehearing is denied. Judge McKee would grant rehearing by the court in banc.
 
 
 
 [1]
 A video poker machine is an electronic device with a video screen at the top and buttons to operate its functions. The object of playing a video poker machine is to obtain the best poker hand possible on the video screen. The machine awards points for winning poker hands. A video poker machine is used as a gambling device when a player receives a cash payoff for the points won. In this case employees of the establishments where the video poker machines were located made the payoffs. After making the payoff, the employee eliminated the points from the machine through the use of a "knock-off" device built into the machine. A separate accounting or bookkeeping mechanism in the machine keeps track of the money put into the machine and the points knocked off the machine. A video poker machine equipped with knock-off and bookkeeping functions facilitates the use of the machine for gambling because it enables the owner of the machine to determine how much money was put into the machine and how much money was paid out to players
 
 
 [2]
 Some video poker machines were placed in facilities that could not be regarded strictly as businesses
 
 
 [3]
 Following the trial we issued an unreported opinion involving a co-defendant which we discuss below. United States v. Smith, No. 95-3391, 70 F.3d 1258 (3d Cir. Oct.24, 1995)
 
 
 [4]
 The application note indicates that "subsection d should only be applied with respect to an object offense alleged in the conspiracy count if the court, were it sitting as a trier of fact, would convict the defendant of conspiracy to commit that object offense." While this application note in itself probably would mandate the reasonable doubt standard, any question regarding that point is eliminated by the commentary to amendment 75 of the guideline which explained when section 1B1.2(d) and application note 5 were adopted that "this decision should be governed by a reasonable doubt standard."
 
 
 [5]
 Griffin overruled United States v. Tarnopol 561 F.2d 466, 474 (3d Cir.1977), where we held that, "[T]he verdict of guilty ... cannot stand if the indictment was insufficient in law in that any one of the three objectives of the conspiracy did not constitute a crime or if the evidence was insufficient to sustain a finding by the jury that any one of these activities had been engaged in."
 
 
 [6]
 The issue presented in these cases is not before us, but we assume for the sake of argument that it was correctly decided
 
 
 [7]
 Our harmless error analysis upholding a jury verdict in United States v. Edmonds, 80 F.3d 810, 823-27 (3d Cir.1996) (in banc), was predicated on reasoning similar to that in Peters
 
 
 [8]
 We emphasize that this rationale does not apply to determining the limits of a sentence under a conspiracy statute that incorporates penalty provisions from substantive laws
 
 
 [9]
 Judge McKee believes that the analysis in United States v. Bush, 70 F.3d 557, 561-62 (10th Cir.1995), and United States v. Garcia, 37 F.3d 1359, 1369-71 (9th Cir.1994), cert. denied, --- U.S. ----, 115 S.Ct. 1699, 131 L.Ed.2d 562 (1995), is correct and would reverse the decision of the district court on that basis. However, he feels compelled to join the other members of the panel in affirming the decision of the district court because of United States v. Ryan, 866 F.2d 604, 608-09 (3d Cir.1989). See Third Circuit I.O.P. 9.1
 
 
 [10]
 In United States v. Kikumura we suggested, as an alternative to increasing certain specific procedural standards at sentencing, an approach limiting the
 concededly broad power of legislatures to define, and courts to consider, conduct that is or could be criminalized as an aggravating factor at sentencing. In effect, this approach would require that, for sentencing purposes, certain findings in certain circumstances be made pursuant to the entire panoply of procedural protections that apply at trial.
 Id. at 1101. This approach, in effect, would limit Congress's ability to define certain circumstances as sentencing factors rather than elements of the crime. For the reasons explained above, we do not adopt this approach in this case, but note that nothing in our holding should be read to preclude the application of this approach in another case; indeed McMillan specifically states that the legislature's ability to reallocate or reduce burdens of proof in criminal cases is limited by the Constitution. Id. at 86, 106 S.Ct. at 2416.
 
 
 [11]
 Section 1956 provides in part:
 (a)(1) Whoever, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the process of specified unlawful activity--
 (A)(i) with the intent to promote the carrying on of specified unlawful activity;
 [is guilty of an offense].