

2007 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

9-10-2007

# USA v. Fisher

Precedential or Non-Precedential: Precedential

Docket No. 06-1795

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2007

Recommended Citation

"USA v. Fisher" (2007). *2007 Decisions*. Paper 346.
http://digitalcommons.law.villanova.edu/thirdcircuit_2007/346

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 2007 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———

No. 06-1795

———


UNITED STATES OF AMERICA

v.

TRACY LAMAR FISHER

*Appellant*

———

On Appeal from the United States District Court
for the District of Delaware
(D.C. Civil No. 05-cr-0012)
District Judge:  Honorable Gregory M. Sleet

———


Argued May 7, 2007
Before: RENDELL, JORDAN and
HARDIMAN, *Circuit Judges*.

(Filed: September 10, 2007)

Edson A. Bostic (Argued)
Eleni Kousoulis
Office of Federal Public Defender
704 King Street
First Federal Plaza, Suite 110
Wilmington, DE 19801

  *Attorneys for Appellant*

Ilana H. Eisenstein (Argued)
Office of United States Attorney
1007 North Orange Street, Suite 700
Wilmington, DE 19801

  *Attorneys for Appellee*

―――――

OPINION OF THE COURT

―――――

HARDIMAN, *Circuit Judge*.

This case presents the question we left open in our *en banc* decision in *United States v. Grier*, 475 F.3d 556 (3d Cir. 2007) (*Grier II*): does *United States v. Kikumura,* 918 F.2d 1084 (3d Cir. 1990), remain good law in light of the Supreme Court's landmark decision in *United States v. Booker*, 543 U.S. 220, 125 S. Ct. 738, 160 L. Ed. 2d 621 (2005)?  We hold that it does not.

2

I.

On the evening of January 15, 2005, Detectives Jeffrey Silvers and Andrea Janvier were patrolling Wilmington, Delaware in a marked police car when a visibly shaken pedestrian approached their vehicle. The pedestrian informed the detectives that two men – who were later identified as Defendant Tracy Lamar Fisher and Rashee Lamont Hunter – had attempted to rob him at gunpoint.

Detectives Silvers and Janvier observed the suspects from their patrol car and followed them until they went out of sight. The detectives then parked their patrol car, proceeded on foot until they located the suspects, and ordered them to stop. Instead of obeying the order, the suspects fled and a chase ensued with Hunter in the lead, Fisher behind him, and Detective Silvers leading Detective Janvier in pursuit. Silvers was able to tackle Fisher and take him into custody.

On February 22, 2005, a grand jury sitting in the District of Delaware returned a one-count indictment charging Fisher with unlawful possession of a firearm by a convicted felon, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2). Fisher pleaded guilty to the charge on July 19, 2005. The Probation Office issued its Presentence Investigation Report (PSR), which set forth the circumstances surrounding Fisher's arrest. The Probation Office recommended that Fisher's total offense level be enhanced four levels pursuant to United States Sentencing Guidelines Manual (USSG) § 2K2.1(b)(5) for possession of a firearm in relation to another felony (attempted robbery in the first degree). As an alternative ground for the same

3

enhancement, the Probation Office noted that Fisher's conduct constituted aggravated menacing and reckless endangering, both of which are class E felonies under Delaware law. The PSR also recommended a six-level enhancement under USSG § 3A1.2(c)(1) for creating a substantial risk of serious bodily injury by assaulting a law enforcement officer during the flight from an offense. Finally, the PSR recommended a two-level enhancement pursuant to USSG § 2K2.1(b)(4) because the firearm was stolen.

Fisher challenged these enhancements, so the District Court held an evidentiary hearing on October 17, 2005. At the hearing, only Detective Silvers testified regarding the circumstances of the arrest. According to Silvers, Fisher pointed the gun at him and began to pull the trigger during the chase. The District Court found Silvers's testimony credible as it was "uncontradicted by any other evidence . . . that Fisher did not simply withdraw the gun from his waistband and discard it. At the very least, he moved the barrel of the .38 toward Silvers in a threatening fashion." In light of this factual finding, the District Court determined that Fisher's actions constituted aggravated menacing in violation of 11 Del. Code § 602(b). Moreover, the government proved that Fisher possessed a firearm in connection with the felony of reckless endangering in violation of 11 Del. Code § 604. Accordingly, the District Court imposed a four-level enhancement under USSG § 2K2.1(b)(5) for use of a firearm in connection with another felony. The District Court also imposed a six-level enhancement under USSG § 3A1.2(c)(1) because Fisher intended to cause bodily injury to a known law enforcement officer when he started to apply pressure to the trigger of his firearm while pointing it at

4

Silvers. Finally, the District Court found that Fisher's firearm was stolen and imposed a two-level enhancement pursuant to USSG § 2K2.1(b)(4).

On January 10, 2006, the District Court filed an opinion in which it found the facts necessary to support the two-, four-, and six-level enhancements by a preponderance of the evidence. *See United States v. Fisher*, 421 F. Supp. 2d 785, 792-99 (D. Del. 2006). Consequently, Fisher's adjusted total offense level was 29, his criminal history category was III, and his advisory Guidelines range was 108-120 months. *Id.* at 800. The District Court sentenced him to 108 months in prison.

II.

We have jurisdiction pursuant to 18 U.S.C. § 3742 and 28 U.S.C. § 1291. Because we review a challenge to a precedent of this Court, we must decide whether *Kikumura* remains good law in light of subsequent Supreme Court rulings. *See Mennen Co. v. Atlantic Mut. Ins. Co.,* 147 F.3d 287, 294 n.9 (3d Cir. 1998) (a panel of this Court may overrule the holding of a prior panel which conflicts with intervening Supreme Court precedent). The issue before us is straightforward. Does the Due Process Clause of the Fifth Amendment require a district court to find facts supporting sentencing enhancements by more than a preponderance of the evidence? In *Kikumura,* we recognized that the preponderance standard is generally appropriate, but held that when the enhancements are so substantial as to constitute "the tail that wags the dog" of the defendant's sentence, the facts underlying those enhancements must be established by clear and convincing evidence.

5

*Kikumura,* 918 F.2d at 1098-1103. Despite the straightforward nature of the question presented, the law of sentencing has been so substantially transformed since we decided *Kikumura* that extensive discussion of the question is required.

Fisher filed his timely notice of appeal on March 7, 2006. Three months later, a panel of this Court decided *United States v. Grier,* 449 F.3d 558 (3d Cir. 2006) (*Grier I*). In *Grier I,* the defendant drew and pointed a handgun at another man during an altercation over a stolen bicycle. *Id.* at 561-62. The sentence the district court imposed was based in part upon its finding that a preponderance of the evidence supported the application of USSG § 2K2.1(b)(5), which provided a four-level enhancement for the use of a firearm during a crime. *See id.* at 562. We agreed to hear *Grier en banc* and, at the request of counsel, deferred disposition of Fisher's case until the full Court decided *Grier II.*

On February 7, 2007, we held in *Grier II* that factors affecting sentencing need only be proved by a preponderance of the evidence, even when those facts would constitute a separate offense. *Grier II,* 475 F.3d at 565. Because the sentence Grier received – 108 months – remained within his unenhanced Guidelines range (108-120 months), we found it unnecessary to rule on the continued viability of *Kikumura. Id.* at 568 n.8.

In the wake of *Grier II,* Fisher and the government filed supplemental briefs. Fisher acknowledges our statement in *Grier II* that "the right to proof beyond a reasonable doubt does not apply to facts relevant to sentencing enhancements under an advisory Guidelines regime." *Id.* at 565. Yet Fisher asserts that

6

*Grier II* leaves *Kikumura* undisturbed because the panel's decision in *Grier I* was vacated and *Booker* was decided based on the Sixth Amendment, whereas Fisher raises a Fifth Amendment due process claim. Relying on *Kikumura,* Fisher maintains that the District Court violated his constitutional right to due process of law when it trebled his sentence based on sentencing factors found by a preponderance of the evidence.

In response to Fisher, the government presses three arguments. First, *Grier II* holds that district courts are permitted to find facts relevant to sentencing by a preponderance of the evidence. Second, *Kikumura* is no longer good law after *Booker*. Finally, even if *Kikumura* were good law, it would not control Fisher's case because *Kikumura* dealt with departures, not enhancements, and the enhancements in Fisher's case — which resulted in an approximately threefold increase in his sentence — were not as extreme as they were in *Kikumura*, where they produced a nearly twelvefold increase in the defendant's sentence.

Before we address the parties' arguments, a review of the history of due process at sentencing is appropriate. As we explain, a criminal defendant's due process rights at sentencing encompass those rights set forth in the Supreme Court jurisprudence which discussed due process at sentencing in the pre-Guidelines era, as well as those rights set forth in the Guidelines themselves, as courts have interpreted them. Because Fisher was sentenced in 2006, those cases interpreting the scope of a criminal defendant's rights under mandatory sentencing regimes — while informative as an historical matter

7

— are less pertinent than those decided after *Booker*, which held in 2005 that the Guidelines are merely advisory.

III.

Until the nineteenth century, most criminal laws provided for fixed statutory sentences. *See* Note, *The Admissibility of Character Evidence in Determining Sentence*, 9 U. Chi. L. Rev. 715 (1942). During the 1800s, however, legislatures began to eschew fixed-term sentences in favor of statutory schemes that gave judges discretion to sentence within a permissible range. *See Apprendi v. New Jersey*, 530 U.S. 466, 481, 120 S. Ct. 2348, 147 L. Ed. 2d 435 (2000) (citation omitted). Although defendants possessed a right of allocution under English common law as early as 1689, *see Green v. United States*, 365 U.S. 301, 304, 81 S. Ct. 653, 5 L. Ed. 2d 670 (1961) (plurality opinion), for centuries it remained unclear what other rights, if any, they possessed at sentencing.

By the twentieth century, the transition from legislatively-fixed sentences to sentences imposed after the exercise of judicial discretion began to implicate procedural concerns, some of which would become the subject of constitutional challenges. In 1948, the Supreme Court granted habeas corpus relief to a petitioner who had been sentenced to "ten to twenty in the state penitentiary" after a sentencing hearing where he was unrepresented by counsel and the sentencing judge made material errors in recounting his criminal history. *See Townsend v. Burke,* 334 U.S. 736, 68 S. Ct. 1252, 92 L. Ed. 1690 (1948). In *Townsend*, the Court explained that due process protected a defendant from "the careless or designed pronouncement of

8

sentence on a foundation so extensively and materially false, which the prisoner had no opportunity to correct by the services which counsel would provide." *Id.* at 741. At the same time, the Court emphasized that it was "not the duration or severity of this sentence that renders it constitutionally invalid," and "[t]he sentence being within the limits set by the statute, its severity would not be grounds for relief here even on direct review of the conviction, much less on review of the state court's denial of habeas corpus." *Id.*

Almost twenty years after *Townsend*, the Supreme Court began to define the contours of constitutional rights at sentencing. In *Mempa v. Rhay*, 389 U.S. 128, 137, 88 S. Ct. 254, 19 L. Ed. 2d 336 (1967), the Court held that an indigent defendant had a Sixth Amendment right to counsel at sentencing. In *Specht v. Patterson*, 386 U.S. 605, 87 S. Ct. 1209, 18 L. Ed. 2d 326 (1967), the Court explained that due process protected a person who was convicted under one statute but sentenced to a longer term of imprisonment under another statute which required additional fact-finding by the sentencing judge. *See Specht*, 386 U.S. at 608-10. The *Specht* Court stated: "Due process . . . requires that [the convicted defendant] be present with counsel, have an opportunity to be heard, be confronted with witnesses against him, have the right to cross examine, and to offer evidence of his own. And there must be findings adequate to make meaningful any appeal that is allowed." *Id.* at 610. Following *Specht,* the Court granted a petition for writ of habeas corpus after a defendant's sentence was trebled without explanation following a remand. *See North Carolina v. Pearce,* 395 U.S. 711, 89 S. Ct. 2072, 23 L. Ed. 2d 656 (1969), *overruled in part on other grounds by Alabama v.*

9

*Smith,* 490 U.S. 794, 803, 109 S. Ct. 2201, 104 L. Ed. 2d 865 (1989). In *Pearce,* the Supreme Court explained that "due process also requires that a defendant be freed of apprehension of . . . a retaliatory motivation on the part of the sentencing judge." *Id.* at 725.

One year after *Pearce*, the Supreme Court decided the landmark due process case of *In re Winship*, 397 U.S. 358, 90 S. Ct. 1068, 25 L. Ed. 2d 368 (1970). Although *Winship* was not a sentencing case *per se*, as it involved the constitutional sufficiency of the evidence to support a criminal conviction, it ultimately would have profound implications for sentencing insofar as it established the due process right to be protected "against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *Id.* at 364. The Supreme Court later clarified *Winship* when it held that the "facts" required to be proven beyond a reasonable doubt were limited to the elements of the offense charged. *See Patterson v. New York*, 432 U.S. 197, 210, 97 S. Ct. 2319, 53 L. Ed. 2d 281 (1977).

The implications of *Winship* and *Patterson* at sentencing would not be realized for nearly three decades, however. Following *Patterson,* the Supreme Court reiterated that the process due an accused at trial differed from that due a convicted felon at sentencing. In *Gardner v. Florida*, 430 U.S. 349, 97 S. Ct. 1197, 51 L. Ed. 2d 393 (1977) (plurality opinion), for example, even as the Court held that a convicted felon had a constitutional right to see, deny, and explain information used to determine his sentence and the right to effective assistance of counsel at sentencing, it cautioned:

10

> The fact that due process applies does not, of course, implicate the entire panoply of criminal trial procedural rights. Once it is determined that due process applies, the question remains what process is due. It has been said so often by this Court and others as not to require citation of authority that due process is flexible and calls for such procedural protections as the particular situation demands. Its flexibility is in its scope once it has been determined that some process is due; it is a recognition that not all situations calling for procedural safeguards call for the same kind of procedure.

*See Gardner*, 430 U.S. at 358 n.9 (citation, internal quotation marks, and ellipses omitted). Thus, in *United States v. Grayson*, 438 U.S. 41, 98 S. Ct. 2610, 57 L. Ed. 2d 582 (1978), the Court reaffirmed the "fundamental sentencing principle" that "a judge may appropriately conduct an inquiry broad in scope, largely unlimited either as to the kind of information he may consider, or the source from which it may come." *See Grayson*, 438 U.S. at 50 (citation and internal quotation marks omitted).

During the 1980s, the Supreme Court began identifying substantive considerations that would render a sentence unconstitutional. *See Zant v. Stephens,* 462 U.S. 862, 885, 103 S. Ct. 2733, 77 L. Ed. 2d 235 (1983) (improper to consider race, religion, or political affiliation of defendant). Thus, a sentence was acceptable as long as it was untainted by considerations of race, gender, or similar forbidden grounds, *see Jones v. Superintendent of Rahway State Prison,* 725 F.2d 40, 43 (3d Cir.

11

1984), was not reached in reliance upon misinformation of constitutional magnitude, *see United States v. Matthews*, 773 F.2d 48, 51 (3d Cir. 1985), and was not imposed in violation of a defendant's right of allocution. *See United States v. Bazzano*, 712 F.2d 826, 843 (3d Cir. 1983). Nevertheless, we continued to adhere to the general rule that only "minimal" due process protection was required at sentencing. *See United States v. Palma,* 760 F.2d 475, 477 (3d Cir. 1985).

Also during the 1980s, however, criminal sentencing underwent radical change as states began reinstating systems in which sentences were imposed by legislative command rather than judicial discretion. This time, state legislatures began adopting sentencing guidelines which typically bound the sentencing judge absent grounds for departure. *See* Richard S. Frase, *Sentencing Guidelines in the States: Lessons for State and Federal Reformers*, 6 Fed. Sent. R. 123 (1993). In 1982, Pennsylvania became the third state to adopt binding sentencing guidelines. Four years later, the Supreme Court considered whether those guidelines — the Mandatory Minimum Sentencing Act — ran afoul of due process by treating possession of a firearm as a sentencing factor that a judge could find by a preponderance of the evidence, rather than as an element of the offense that a jury must find beyond a reasonable doubt before conviction. *See McMillan v. Pennsylvania*, 477 U.S. 79, 106 S. Ct. 2411, 91 L. Ed. 2d 67 (1986). After noting that it previously had "rejected the claim that whenever a State links the severity of punishment to the presence or absence of an identified fact the State must prove that fact beyond a reasonable doubt," *id.* at 84 (citation and internal quotation marks omitted), the Supreme Court held that Pennsylvania could treat possession

12

of a firearm as a sentencing factor. *Id.* at 91. The Court then held it constitutional for a judge to find such sentencing factors by a preponderance of the evidence — and not by clear and convincing evidence, as the petitioners had argued — explaining that "[w]e have some difficulty fathoming why the due process calculus would change simply because the legislature has seen fit to provide sentencing courts with additional guidance." *Id.* at 92.

Meanwhile, inspired by the proliferation of some of the states' fledgling guideline systems, the United States Sentencing Commission was hard at work crafting sentencing guidelines for federal offenders that became law in November 1987. *See* United States Sentencing Comm'n, Federal Sentencing Guidelines Manual (1988). As then-Judge Breyer explained, the experts whose input shaped the ultimate form that the Guidelines would take hailed from different schools of thought:

> Some experts urged the adoption of a pure, or a nearly pure, "charge offense" system. Such a system would tie the punishments directly to the offense for which the defendant was convicted. One would simply look to the criminal statute, for example, bank robbery, and read off the punishment provided in the sentencing guidelines . . . . The principal difficulty with a presumptive sentencing system is that it tends to overlook the fact that particular crimes may be committed in different ways, which in the past have made, and still should make, an important difference in terms of the punishment imposed . . . . Thus,

13

unless the statutes are rewritten to make such distinctions, the sentencing court is asked to look, at least in part, at what *really* happened under the particular factual situation before it.

A "real offense" system, in contrast, bases punishment on the elements of the specific circumstances of the case. Some experts have argued for guidelines close to a pure "real offense" system, where each added harm that the offender brought about would lead to an increase in the sentence. The proponents of such a system, however, minimize the importance of the *procedures* that the courts must use to determine the existence of the additional harms, since the relevant procedural elements are not contained in the typical criminal statute . . . . There must be a post-trial procedure for determining such facts. Making such post-trial procedures administratively manageable is difficult. Typically, courts have found post-trial sentencing facts without a jury and without the use of such rules of evidence as the hearsay or best evidence rules, or the requirement of proof of facts beyond a reasonable doubt.

Of course, the more facts the court must find in this informal way, the more unwieldy the process becomes, and the less fair that process appears to be. At the same time, however, the requirement of full blown trial-type post-trial procedures,

which include jury determinations of fact, would threaten the manageability that the procedures of the criminal justice system were designed to safeguard.

*See* Stephen Breyer, *The Federal Sentencing Guidelines and the Key Compromises upon Which They Rest*, 17 Hofstra L. Rev. 1, 9-11 (1988) (emphasis in original) (footnotes omitted). Accordingly, through the Guidelines, Congress attempted to synthesize the administrative facility of a "charge offense" system with the substantive fairness of a "real offense" regime:

> The upshot is a need for a compromise. A sentencing guideline system must have some real elements, but not so many that it becomes unwieldy or procedurally unfair. The Commission's system makes such a compromise. It looks to the offense *charged* to secure the "base offense level." It then modifies that level in light of several "real" aggravating or mitigating factors, (listed under each separate crime), several "real" general adjustments ("role in the offense," for example) and several "real" characteristics of the offender, related to past record.

*Id.* at 11-12 (emphasis in original) (footnotes omitted). "It is difficult to contend, therefore, that either a pure unmixed 'charge' or 'real offense' system would achieve the Commission's objectives." *Id.* at 12.

15

One of the most important features of the original Guidelines was that sentencing within the Guidelines range was mandatory. *See* 18 U.S.C.A. § 3553(b) (West 1985 & Supp. 1988); *see also Mistretta v. United States*, 488 U.S. 361, 367, 109 S. Ct. 647, 102 L. Ed. 2d 714 (1989); *United States v. Uca*, 867 F.2d 783, 786 (3d Cir. 1989). Notwithstanding the mandatory nature of the Guidelines, the Supreme Court noted that sentences were susceptible of appellate review:

> Before the Guidelines system, a federal criminal sentence within statutory limits was, for all practical purposes, not reviewable on appeal. The Act altered this scheme in favor of a limited appellate jurisdiction to review federal sentences. Among other things, it allows a defendant to appeal an upward departure and the Government to appeal a downward one.

*Koon v. United States,* 518 U.S. 81, 96, 116 S. Ct. 2035, 135 L. Ed. 2d 392 (1996) (citations omitted). Accordingly, the Guidelines permitted the defendant to appeal if his sentence was imposed in violation of law, resulted from an incorrect application of the Guidelines, exceeded the sentence specified in the applicable Guidelines range, or was imposed for an offense for which there was no sentencing guideline and was "plainly unreasonable." *See* 18 U.S.C.A. § 3742(a). Additionally, the sentencing court was required to contemplate various policy objectives in reaching its sentence, *see* 18 U.S.C. § 3553(a), and to articulate reasons for the sentence it imposed to provide the reviewing court a principled means of

16

ascertaining whether an abuse of discretion had occurred. *See* 18 U.S.C. § 3553(c).

The foregoing constraints added by the Guidelines, along with the due process protections that the Court had recognized since the late 1940s, constituted the full panoply of rights that a federal criminal defendant enjoyed at sentencing by the 1990s. Such was the state of the law at the time we decided *United States v. Kikumura,* 918 F.2d 1084 (3d Cir. 1990), to which we now turn.

IV.

Kikumura was convicted of twelve explosives and passport offenses which resulted in a Guidelines range of 27 to 33 months in prison. *See Kikumura*, 918 F.2d at 1089. At the conclusion of the sentencing hearing, however, the district court found that a statutory maximum sentence of 360 months was warranted because Kikumura had made three firebombs in preparation for a terrorist bombing on American soil. *Id*. We reversed.

Quoting then-Judge Breyer's law review article on the subject of the compromise between a charge-offense system and a real-offense system that the Guidelines instantiated, we wrote:

> Perhaps like no case ever before reported, this one illustrates both the utility of, and the dangers in, real offense sentencing — a system that metes out punishment on the basis of a defendant's actual conduct in a particular case. Such a system

17

recognizes that particular crimes may be committed in different ways, which in the past have made, and still should make, an important difference in terms of the punishment imposed. Because criminal statutes have never been (and probably never could be) written with sufficient particularity to take all such factors into account, a system of pure charge offense sentencing — one that metes out punishment solely on the basis of the offense of conviction — would necessarily abstract away considerations obviously relevant in determining an appropriate sentence.

*Id.* at 1098-99 (citation and internal quotation marks omitted). Although real offense sentencing was a "practical necessity," it "could create the potential for significant unfairness" insofar as the procedural protections at sentencing were "significantly lower than those applicable at the trial itself." *Id.* at 1099. Because the sentence Kikumura received was approximately 12 times that prescribed by the Guidelines, we held that the trial court was required to find sentencing facts by more than a mere preponderance of the evidence. *See id.* at 1102. We concluded:

*McMillan* held that a preponderance standard was generally constitutional but suggested that a different question would be presented if the magnitude of a contemplated departure was sufficiently great that the sentencing hearing can be fairly characterized as a tail which wags the dog of the substantive offense . . . . For the reasons explained above, we hold that in such

18

> situations, the factfinding underlying that departure must be established at least by clear and convincing evidence.

*Id.* at 1101 (citation and internal quotation marks omitted). Significantly, however, we were careful to note that "the clear and convincing standard is, under these circumstances, implicit in the statutory requirement [of now-excised § 3553(b)(1)] that a sentencing court 'find' certain considerations in order to justify a departure . . . ." *Id.* at 1102. Thus, in *Kikumura* we specifically "reserve[d] judgment on the question whether [the clear and convincing standard] is also implicit in the due process clause itself." *Id.*

Throughout the 1990s, we required district courts to sentence a convicted defendant within the Guidelines range set forth for his particular crime — after accounting for all of the attendant circumstances — reversing them whenever they failed to adhere to the mandate of § 3553(b). *See United States v. Bierley*, 922 F.2d 1061, 1067 (3d Cir. 1990); *see also United States v. Johnson,* 931 F.2d 238, 241 (3d Cir. 1991); *United States v. Bertoli,* 40 F.3d 1384, 1408 (3d Cir. 1994); *United States v. Felton*, 55 F.3d 861, 866 (3d Cir. 1995); *United States v. Schwegel*, 126 F.3d 551, 553 (3d Cir. 1997). During that era, we also followed *Kikumura*, usually taking care to note that its application went hand-in-hand with the then-mandatory force of the Guidelines. *See, e.g., United States v. Mack*, 229 F.3d 226, 233 (3d Cir. 2000) (observing that the clear and convincing standard "was required in light of 18 U.S.C. § 3553(b)'s directive that the sentencing court 'find' certain considerations to justify a departure.") (footnote omitted); *see also United*

19

*States v. Murray*, 144 F.3d 270, 275 (3d Cir. 1998) (citing *Kikumura*'s "tail which wags the dog" standard in tandem with 18 U.S.C. § 3553(b)).

Because 18 U.S.C. § 3553(b) remained in full force throughout the 1990s, we did not have occasion to consider whether due process required a higher burden of proof in similar circumstances. Rather than resolve this issue, in reaffirming *McMillan*, the Supreme Court declined to decide whether a higher burden of proof may be required for some sentencing facts. *See United States v. Watts*, 519 U.S. 148, 156-57, 117 S. Ct. 633, 136 L. Ed. 2d 554 (1997) (per curiam) (citing *Kikumura* and noting a conflict among courts of appeals regarding "whether, in extreme circumstances, relevant conduct that would dramatically increase the sentence must be based on clear and convincing evidence" but declining to resolve that split).

In the late 1990s, criminal defendants argued that judges applying mandatory sentencing guidelines by a preponderance of the evidence were making factual findings which, in effect, increased their total sentences beyond the statutory maximum for the crimes of which they were convicted. In *Apprendi*, the Supreme Court considered whether New Jersey's hate-crime statute — which authorized a sentence above the statutory maximum if the judge found that the crime had been committed "with a purpose to intimidate" because of race or other factors — was consistent with the principles established in *Winship*. *Apprendi*, 530 U.S. at 491-92. The Court held the New Jersey statute unconstitutional under the Fifth and Sixth Amendments, stating: "Other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory

20

maximum must be submitted to a jury, and proved beyond a reasonable doubt." *Id.* at 489. The Court noted the limits of its holding, however:

> We should be clear that nothing in this history suggests that it is impermissible for judges to exercise discretion — taking into consideration various factors relating both to offense and offender — in imposing a judgment *within the range* prescribed by statute. We have often noted that judges in this country have long exercised discretion of this nature in imposing sentence *within statutory limits* in the individual case.

*Id.* at 481 (emphasis in original) (citing *Williams v. New York*, 337 U.S. 241, 246, 69 S. Ct. 1079, 93 L. Ed. 1337 (1949)).

Two Terms later, the Court was asked to determine whether *McMillan* survived *Apprendi* when it considered anew the question whether judicial factfinding triggering mandatory minimum sentences violated the Constitution. In *Harris v. United States,* 536 U.S. 545, 122 S. Ct. 2406, 153 L. Ed. 2d 524 (2002) (plurality opinion), the Court reaffirmed *McMillan*'s holding, explaining that even after *Apprendi* judges could continue to find facts which triggered mandatory minimum sentences. In so doing, the Court underscored the distinction between "sentencing factors" that a judge could find by a preponderance of the evidence, and "elements" which were required to be submitted to a jury and found beyond a reasonable doubt:

21

[N]ot all facts affecting the defendant's punishment are elements. After the accused is convicted, the judge may impose a sentence within a range provided by the statute, basing it on various facts relating to the defendant and the manner in which the offense was committed. Though these facts may have a substantial impact on the sentence, they are not elements, and thus not subject to the Constitution's indictment, jury, and proof requirements. Some statutes also direct judges to give certain weight to certain facts when choosing the sentence. The statutes do not require these facts, sometimes referred to as sentencing factors, to be alleged in the indictment, submitted to the jury, or established beyond a reasonable doubt.

*Harris*, 536 U.S. 549-50. In sum: "The Fifth and Sixth Amendments ensure that the defendant will never get *more* punishment than he bargained for when he did the crime, but they do not promise that he will receive anything less than that." *Id.* at 566 (citation and internal quotation marks omitted) (emphasis in original).

The boundary established by *Harris* was tested in challenges to mandatory sentencing laws in two states. In *Ring v. Arizona,* 536 U.S. 584, 122 S. Ct. 2428, 153 L. Ed. 2d 556 (2002), the Supreme Court applied *Apprendi* to hold unconstitutional an Arizona law which authorized the death penalty if the judge found a single aggravating factor. *Id.* at 592-93. Likewise, in *Blakely v. Washington,* 542 U.S. 296, 124

22

S. Ct. 2531, 159 L. Ed. 2d 403 (2004), the Court held unconstitutional a Washington law which permitted a judge to exceed the relevant maximum penalty for kidnaping if the defendant acted with "deliberate cruelty." *Id.* at 304-05.

Just one term after *Blakely*, the Court established a new sentencing paradigm in *Booker*, a decision that resulted in two separate 5-4 majority opinions. In the first part of its opinion, the Court held that Booker had been deprived of his Sixth Amendment right to trial by jury when he received a sentence over eight years greater than the top of his original Guidelines range based on facts found by the District Court by a preponderance of the evidence. *See Booker*, 543 U.S. at 233 (Stevens, J.). Rather than hold the entire Guidelines scheme unconstitutional, however, in the second part of its opinion the Court held that 18 U.S.C. § 3553(b)(1) — the provision which made the Guidelines mandatory — was unconstitutional, and severed this provision from the statute. *See id.* at 245 (Breyer, J.). The Court observed that its ruling made "the Guidelines effectively advisory," *id.* at 245-46, and explained:

> The remainder of the Act "functions independently." Without the "mandatory" provision, the Act nonetheless requires judges to take account of the Guidelines together with other sentencing goals. The Act nonetheless *requires* judges to consider the Guidelines "sentencing range established for . . . the applicable category of offense committed by the applicable category of defendant," the pertinent Sentencing Commission policy statements, the need to avoid

23

unwarranted sentencing disparities, and the need to provide restitution to victims[.] And the Act nonetheless *requires* judges to impose sentences that reflect the seriousness of the offense, promote respect for the law, provide just punishment, afford adequate deterrence, protect the public, and effectively provide the defendant with needed educational or vocational training and medical care.

*Booker*, 543 U.S. at 259-60 (citations and alterations omitted) (emphasis added) (citing Section 3553(a)). After *Booker*, as before it, appellate courts are required to apply Section 3553(a) "in determining whether a sentence is unreasonable." *Id.* at 261.

Such was the state of the law at the time we considered *Grier II en banc*. We now turn to Fisher's argument that the Due Process Clause of the Fifth Amendment required the sentencing Court to find the facts supporting the enhancements by more than a mere preponderance of the evidence.

V.

As Fisher notes, the "facts of *Grier* are remarkably similar to this case." Both cases applied the four-level enhancement of USSG § 2K2.1(b)(5) after the trial judge found by a preponderance of the evidence that the defendant pointed a handgun at another person during the commission of a felony. In *Grier II*, we stated that "[j]udicial factfinding in the course of selecting a sentence within the permissible [Guidelines] range does not offend the Fifth and Sixth Amendment rights to a jury

24

trial and proof beyond a reasonable doubt." *Grier II*, 475 F.3d at 562. Insofar as *Booker* rendered the Guidelines advisory, we reasoned that "the maximum legislatively authorized punishment to which the defendant is exposed is no longer the maximum prescribed by the Guidelines; instead, it is the maximum prescribed by the United States Code." *Id.* at 564. Because "[n]one of the facts relevant to enhancements or departures under the Guidelines can increase the maximum punishment to which the defendant is exposed," *id.* at 565-66, we explained that they need not be proven beyond a reasonable doubt. We concluded: "Under an advisory Guidelines scheme, district courts should continue to make factual findings by a preponderance of the evidence and courts of appeals should continue to review those findings for clear error." *Id.* at 561.

The government argues that *Grier II* overruled *Kikumura*. A majority of the original three-judge panel in *Grier I* had overruled *Kikumura* to the extent that it had relied on *McMillan*'s "tail wagging the dog" metaphor to impose a higher standard of proof for sentencing facts which resulted in a large impact on the overall sentence. *See Grier I*, 449 F.3d at 570 (the basis of *McMillan's* "tail wagging the dog" concern was disavowed by the Supreme Court in *Blakely*). The *en banc* panel in *Grier II* brought *Kikumura* back from the grave but, for all intents and purposes, left it on life-support, explaining: "While we acknowledge that the statutory and constitutional underpinnings of [*Kikumura*] may be questioned by the Supreme Court's reasoning in *Booker*, this case does not present a factually similar case to *Kikumura*" because "there was ultimately no departure from the [initial] recommended Guidelines range." *See Grier II*, 475 F.3d at 568 n.8.

25

Accordingly, we found that it was "not necessary for us to reach the current status of *Kikumura*." *Id.*

In Fisher's case, however, the issue is unavoidable. Unlike Grier, Fisher was sentenced to a term of imprisonment almost three times greater than the top of his unenhanced Guidelines range. Thus, we must ask: did *Kikumura* require the District Court to apply an elevated burden of proof to support its imposition of the enhancements which comprised the lion's share of Fisher's sentence? In light of *Booker* and *Grier II*, the answer to this question is "no."

As *Grier II* made plain, under an advisory system "[f]acts relevant to enhancements under the Guidelines would no longer increase the maximum punishment to which the defendant is exposed, but would simply inform the judge's discretion as to the appropriate sentence." *Grier II*, 475 F.3d at 564. Accordingly, sentencing judges are free to find facts by a preponderance of the evidence, provided that the sentence actually imposed is within the statutory range, and is reasonable. *Id.* at 568-71; *see also Rita v. United States,* - - - U.S. - - - -, 127 S. Ct. 2456, 2462 (2007). In other words, although concerns about the "tail wagging the dog" were valid under a mandatory guideline system — like the Pennsylvania system addressed in *McMillan* and the federal Guidelines when *Kikumura* was decided — these concerns were put to rest when *Booker* rendered the Guidelines advisory. For this reason, we hold that *Kikumura* is no longer valid as long as the Guidelines are advisory.

Although Fisher acknowledges that *Kikumura*'s holding was predicated on the then-mandatory nature of the Guidelines, he argues that we have embraced a constitutional justification for that decision which survived the Supreme Court's excision of 18 U.S.C. § 3553(b) in *Booker*. *See United States v. Conley,* 92 F.3d 157 (3d Cir. 1996) and *United States v. Mobley,* 956 F.2d 450 (3d Cir. 1992). It is true that *Conley* and *Mobley* both characterized *Kikumura* as rooted in due process. *See Conley*, 92 F.3d at 168, *Mobley*, 956 F.2d at 458-59. But whether a right is "statutory" or "constitutional" is not the relevant question here. Instead, the proper question is this: was that right — whatever its provenance — infringed when Fisher was sentenced under an advisory regime on facts found by a preponderance of the evidence? We hold that it was not and that due process was not infringed.

The critical distinction here is the advisory nature of the Guidelines under which Fisher was sentenced. A criminal defendant sentenced under a mandatory regime — such as the Guidelines scheme at issue in *Kikumura, Conley,* and *Mobley* — may be entitled to additional or different process than that due a defendant sentenced under the post-*Booker* advisory Guidelines. After *Booker* and *Grier II,* however, it is clear that sentencing on facts found by a preponderance of the evidence does not infringe upon a defendant's rights, whether those rights are derived from the Guidelines or the Constitution.

In reaching this conclusion, we join the growing number of courts to have recognized that *Kikumura* does not survive *Booker*. For example, in *United States v. Brika*, 487 F.3d 450, 460-62 (6th Cir. 2007), the Court of Appeals for the Sixth

27

Circuit affirmed a sentence where, as here, the district court found the factual predicates to support enhancements by a preponderance of the evidence — even though the enhancements elevated Brika's sentence beyond the original guideline range. *See Brika*, 487 F.3d at 460-61. In so holding, the Sixth Circuit rejected Brika's contention that the Fifth and Sixth Amendments required a higher standard of proof, and explained why *Kikumura*'s concerns about the "tail wagging the dog" were no longer apposite.

> *Kikumura*'s reasoning might have had some basis in due process principles under the mandatory guidelines regime. That is so because a defendant had an entitlement to be sentenced within his guidelines range absent circumstances justifying upward departure. However, after *Booker*, the only constraints on sentencing judges are the statutory maximum and minimum for the offense at issue and the sentencing statutes, particularly 18 U.S.C. § 3553(a). [¶] Viewed in this light, [the defendant] could not have had a reasonable expectation that he would have received a sentence within his guidelines range absent the application of the various enhancements. Instead, he had only an entitlement to be sentenced to a reasonable sentence within the statutory range.

*Id.* at 461 (citation omitted). As *Brika* makes clear, challenges to "large enhancements . . . should be viewed through the lens of *Booker* reasonableness rather than that of due process." *Id.* at 462 (citation omitted). We agree and, although we do not

28

suggest that sentencing never implicates due process — as the foregoing history of due process at sentencing makes clear, it does — we note that the Supreme Court has yet to define the relationship between the due process protections applicable at sentencing and *Booker* reasonableness review. We agree with our concurring colleague that sentences based upon arbitrary or impermissible considerations (*e.g.,* sentencing Yankees fans more harshly than Red Sox fans) would offend the due process principles established since *Townsend.* But this does not change the fact that since the Supreme Court's decisions in *Booker* and *Rita,* and this Court's decision in *Grier II,* conduct relevant to sentencing enhancements must be proven by a preponderance of the evidence, and the resulting sentence is reviewed for substantive reasonableness on appeal. *See Booker,* 543 U.S. at 260-64; *Grier II,* 475 F.3d at 568; *Rita,* 127 S. Ct. 2464.

Similarly, in *United States v. Reuter,* 463 F.3d 792, 793 (7th Cir. 2006), the Seventh Circuit opined that the "tail-wagging-the-dog" debate had been "rendered academic" by *Booker*, explaining:

> With the guidelines no longer binding the sentencing judge, there is no need for courts of appeals to add epicycles to an already complex set of (merely) advisory guidelines by multiplying standards of proof. The judge is cabined, but also liberated, by the statutory sentencing factors. Unlike the guidelines, they bind, but they are broad enough and loose enough to allow the judge to dip below the guidelines range if he is justifiably reluctant to impose a sentence most of

29

which rests entirely on a finding of fact supported by a mere preponderance of the evidence (though in this case, to repeat, the evidence was overwhelming). Section 3553(a)(2)(A) includes among the factors to be considered in sentencing "the need for the sentence imposed . . . to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense." A judge might reasonably conclude that a sentence based almost entirely on evidence that satisfied only the normal civil standard of proof would be unlikely to promote respect for the law or provide just punishment for the offense of conviction. That would be a judgment for the sentencing judge to make and we would uphold it so long as it was reasonable in the circumstances.

*Reuter*, 463 F.3d at 793 (citations omitted); *see also United States v. Vaughn,* 430 F.3d 518, 525 (2d Cir. 2005) ("[A]fter *Booker,* district courts' authority to determine sentencing factors by a preponderance of the evidence endures and does not violate the Due Process Clause of the Fifth Amendment.").

We reject Fisher's invitation to follow *United States v. Archuleta,* 412 F.3d 1003 (8th Cir. 2005) and *United States v. Staten,* 466 F.3d 708, 717-18 (9th Cir. 2006), which held that *Kikumura* remains good law after *Booker.* In *Archuleta,* the Eighth Circuit reaffirmed its adherence to *Kikumura,* but did so without discussion beyond the conclusory statement that *Booker* had changed nothing. *See Archuleta*, 412 F.3d at 1007. We consider the reasoning of *Brika* and *Reuter* to be much more

thorough and thoughtful. In *Staten,* the Ninth Circuit held that, insofar as it is still possible after *Booker* for a court to levy a sentence "extremely disproportionate relative to the offense of conviction," a clear-and-convincing burden of proof applies. *See Staten*, 466 F.3d at 717-18. We decline to follow *Staten* because we disagree with its premise. After *Booker*, the "offense of conviction" is defined by the United States Code; thus, a reasonable sentence which does not exceed the maximum prescribed by the Code cannot possibly be "disproportionate to the offense of conviction."

We are cognizant that, even under an advisory Guidelines regime, enhancements such as those visited upon Fisher in this case represent an important component of the first step in sentencing, *viz.,* calculating the appropriate Guidelines range. As we explained in *United States v. Gunter*, 462 F.3d 237 (3d Cir. 2006):

> O]ur post-*Booker* precedent instructs district courts to follow a three-step sentencing process. (1) Courts must continue to calculate a defendant's Guidelines sentence precisely as they would have before *Booker*. (2) In doing so, they must formally rule on the motions of both parties and state on the record whether they are granting a departure and how that departure affects the Guidelines calculation, and take into account our Circuit's pre-*Booker* case law, which continues to have advisory force. (3) Finally, they are required to exercise their discretion by considering the relevant § 3553(a) factors in setting the sentence

31

> they impose regardless whether it varies from the
> sentence calculated under the Guidelines.

*Gunter*, 462 F.3d at 247 (alterations, citations, and internal quotation marks omitted).

Consistent with the Supreme Court's holding in *Booker,* we are confident that district judges appreciate fully the grave responsibility they bear in sentencing the defendants who appear before them. We also recognize that district judges are in the best position to impose just sentences in light of their proximity to, and familiarity with, each individual defendant. *See Rita*, 127 S. Ct. at 2469. In discharging their solemn duty, district judges are free to vary — one way or the other — from the advisory Guidelines, provided that those variations are reasonable under the circumstances. *See Rita,* 127 S. Ct. at 2465; *see also Cooper*, 473 F.3d at 331. If, after calculating the appropriate Guidelines, a district judge finds that the imposition of a within-Guidelines sentence would visit an injustice upon the defendant pursuant to 18 U.S.C. § 3553(a), it is incumbent upon the judge to say so, and sentence below the Guidelines range. Conversely, when the Guidelines range is too low to satisfy 18 U.S.C. § 3553(a), the district judge must explain why this is so and vary upward. *See Rita*, 127 S. Ct. at 2464, 2466. In sum, because the Guidelines are now advisory and district judges are empowered to discharge their duties fully in the first instance, it is a logical impossibility for the "tail to wag the dog," as could occur when the Guidelines were mandatory.

## VI.

Having determined that the District Court correctly applied a preponderance-of-the-evidence standard in finding the factual predicates for Fisher's sentencing enhancements, we now examine the remainder of its sentencing procedure to determine whether the sentence imposed was reasonable. "[R]easonableness is a range, not a point." *See Cooper*, 473 F.3d at 332 n.11 (citation omitted). *See Grier II*, 475 F.3d at 569-70. We evaluate the reasonableness of a sentence by "review[ing] factual findings relevant to the Guidelines for clear error and [by] exercis[ing] plenary review over a district court's interpretation of the Guidelines." *See Grier II*, 475 F.3d at 570. This is a three-step process. First, we determine whether the sentencing court correctly calculated the Guidelines range. *See Cooper,* 437 F.3d at 327-28. Next, we determine whether the trial court "considered the § 3553(a) factors and any sentencing grounds properly raised by the parties which have recognized legal merit and factual support in the record." *Id.* at 332. Finally, we "ascertain whether those factors were reasonably applied to the circumstances of the case." *Id.* Thus, once we have ascertained that the District Court followed the procedure set forth in *Gunter*, we review the resulting sentence to ensure that it is substantively reasonable. *See Rita*, 127 S. Ct. 2464 (noting that "when the judge's discretionary decision accords with the Commission's view of the appropriate application of § 3553(a) in the mine run of cases, it is probable that the sentence is reasonable."); *see also Booker*, 543 U.S. at 261 (explaining that the substantive factors set forth in § 3553(a) "will guide appellate courts, as they have in the past, in determining whether a sentence is unreasonable.").

33

Although Fisher insists that the District Court should have made its factual findings by more than a preponderance of the evidence, he does not argue that the District Court's factual findings were clearly erroneous when assessed against that standard of review. Indeed, the factual findings were well-supported by Detective Silvers's testimony, which the District Court found credible, that Fisher pointed the stolen handgun at Silvers while fleeing law enforcement. Nor does Fisher contend that the District Court overlooked any of the § 3553(a) factors that he contended were applicable to his situation.

Instead, Fisher claims that his sentence was unreasonable under 18 U.S.C. § 3553(a) because the application of both enhancements under USSG § 2K2.1(b)(5) and § 3A1.2(c)(1) overstates the nature and seriousness of his offense. This argument is unpersuasive. We have recognized that the Guidelines explicitly note when double counting is forbidden. *See United States v. Wong,* 3 F.3d 667, 670 (3d Cir. 1993). "[O]nly when the Guidelines explicitly prohibit double counting will it be impermissible to raise a defendant's offense level under one provision when another offense Guideline already takes into account the same conduct." *Id.* at 671.

Our review of the pertinent Guidelines confirms that they do not prohibit double-counting in the situation presented here. Each of the enhancements in question involves conduct which the other does not — Section 2K2.1 involves the use of a firearm, whereas Section 3A1.2 involves a law-enforcement officer victim — as other courts have found. *See United States v. Coldren*, 359 F.3d 1253, 1256-57 (10th Cir. 2004) (applying both enhancements where a defendant pointed a firearm at a

34

police officer); *see also United States v. Jackson*, 276 F.3d 1231, 1234 (11th Cir. 2001) (same, where defendant reached for a gun during a struggle with police); *United States v. Bowie*, 198 F.3d 905 (D.C. Cir. 1999) (same).  The fact that Section 2K2.1 is a conduct-related enhancement while Section 3A1.2 is a victim-related enhancement undermines the double-counting claim.  *See United States v. Haines*, 32 F.3d 290, 293 (7th Cir. 1994) (finding no double-counting where one enhancement was based on the nature of the conduct, whereas another enhancement was based on the identity of the victim).

Apart from the proper application of the aforementioned enhancements, there is no question that the District Court's sentence was reasonable.  Applying the 18 U.S.C. § 3553(a) factors, the District Court explicitly stated that it considered Fisher's background and age, the length of his previous incarceration for shooting another person, and his evident "unwillingness to comport his behavior with the norms of society" in reaching an appropriate sentence.  Indeed, the record showed that Fisher had been imprisoned for ten years for shooting another person in the chest during an armed robbery in 1990.  Shortly after his release from prison, Fisher acquired a stolen handgun, drove to a neighboring city, and teamed up with Hunter (who was also armed) — evidently with the intention of robbing passersby at gunpoint — and committed the instant crime.  When Fisher saw that police had been alerted, he fled and, near the end of the chase, pointed the loaded handgun at Detective Silvers.  In light of the foregoing, the District Judge explained his assessment of the § 3553(a) factors as follows:

35

[T]he one [crime] that you committed in 1990 was of such magnitude, such an order of magnitude that the criminal justice system that handled that responded in the way that it did and incarcerated you, ordered your incarceration for a very substantial period of time. After a brief period of freedom . . . you came before me for this offense . . . . [T]he Court has concluded that under the circumstances, given your background, given the length of the previous incarceration, given your age, it is remarkable . . . that someone of your years of maturity at the time you committed this offense would still continue to be engaged in this kind of conduct . . . . So it doesn't seem that the punishment that has been handed to you thus far has made a sufficient impression on you to cause you to come into compliance with the norms of society.

The record, including the foregoing statement, shows that Fisher's sentence was imposed after proper consideration of his criminal history, his conduct during his most recent crime, and the need "to protect society" from his criminal activity.

VII.

Although the four- and six-level enhancements are the focal point of Fisher's appeal, he also argues that the District Court erred when it applied the two-level stolen-firearms enhancement pursuant to § 2K2.1(b)(4). Fisher argues that the sentencing judge erred when he stated that the stolen weapon

36

enhancement was "not factoring very significantly into my thinking as to an appropriate sentence," but nonetheless included that enhancement in his calculation of Fisher's total offense level. We disagree.

The record does not support Fisher's contention that the District Court was equivocal about applying the stolen-firearms enhancement in the first place. Rather, the record demonstrates that, although the sentencing judge included this enhancement at step one, he discounted the relevant conduct underlying the enhancement in the sound exercise of his discretion when applying the § 3553(a) factors at step three of the sentencing process. *See Gunter*, 462 F.3d at 247; *see also Grier II*, 475 F.3d at 587-88 (Ambro, concurring) (observing that "nothing about the majority's ruling *prevents* a sentencing court from taking into account the strength of the evidence (or lack thereof) supporting a Guidelines enhancement when it considers the § 3553(a) factors at *Gunter'*s step three — especially an enhancement that also constitutes a separate crime.") (emphasis in original). This was the District Court's prerogative.

## VIII.

In sum, we conclude that the District Court did not err when it found facts relevant to sentencing by a preponderance of the evidence, its factfinding was not clearly erroneous, and the Guidelines permitted the District Court to apply both the four- and six-level enhancements. *See Wong,* 3 F.3d 671; *see also Grier II*, 475 F.3d at 561. We further find that the District Court diligently considered the pertinent § 3553(a) factors and applied them reasonably to Fisher's particular circumstances.

37

*See Gunter*, 462 F.3d at 247; *see also Cooper,* 437 F.3d at 327-28, 332. Finally, the District Court did not err when it discounted the stolen gun enhancement as part of its § 3553(a) analysis. Accordingly, we will affirm the judgment of the District Court.

RENDELL, *Circuit Judge*, concurring.

I agree with the majority that our narrow holding in *United States v. Kikumura*, 918 F.2d 1084, 1102 (3d Cir. 1990), that 18 U.S.C. § 3553(b) requires a court to find sentencing facts that result in a massive upward departure by clear and convincing evidence, has no relevance in the post-*Booker* world given that 18 U.S.C. § 3553(b) has been excised from the Sentencing Reform Act. *See United States v. Booker*, 543 U.S. 220, 245 (2005). However, our decision in *Kikumura* to require a heightened standard of proof at sentencing in certain circumstances addressed a due process concern that I submit still exists. A defendant's due process rights are implicated when facts found by a judge under a preponderance standard concerning a separate, uncharged crime result in a dramatic increase in the sentence actually imposed on the defendant for the crime of conviction, so as to suggest that the defendant is really being sentenced for the uncharged crime rather than the crime of conviction. *See United States v. Grier*, 475 F.3d 556, 573 (3d Cir. 2007) (Rendell, J., concurring). Writing for the court in *Kikumura*, Judge Becker noted the increase in Kikumura's sentence from about 30 months to 30 years, resulting from the judge's finding that Kikumura intended to commit multiple, uncharged murders, and observed: "In this extreme context, we believe, a court cannot reflexively apply

38

the truncated procedures that are perfectly adequate for all of the more mundane, familiar sentencing determinations." *Kikumura,* 918 F.2d at 1101. This statement rings true today, wherever such an "extreme context" repeats itself. Thus, it is still possible even under the current advisory Guidelines regime for a defendant's due process rights to be violated at sentencing when findings concerning collateral conduct become the "tail which wags the dog of the substantive offense." *Kikumura*, 918 F.2d at 1100-01 (quoting *McMillan v. Pennsylvania*, 477 U.S. 79, 88 (1986)).

Judge Rosenn, in his concurrence in *United States v. Kikumura*, described a set of circumstances that would raise such due process concerns:

> Suppose the police apprehend a man who is driving recklessly with the intention to meet others in a robbery conspiracy. State officials only charge and convict the man with violating traffic ordinances, but at the man's sentencing hearing argue that the underlying motive for the man's speeding was participation in a robbery at another end of town. The sentencing judge finds the state's evidence convincing and sentences the defendant as if he had been convicted of conspiracy to commit a robbery.

*Id*. at 1121 (Rosenn, J., concurring).

The transition from the mandatory Guidelines regime in place at the time that Kikumura was sentenced to the current

advisory one alters, but does not eliminate, the potential for due process concerns to arise at sentencing. While, admittedly, the sentencing landscape has changed since *Kikumura* was decided, I do not agree that the advent of the advisory Guidelines regime is all that relevant to the due process issue before the court in *Kikumura* or before us here. The absence of a legally mandated relationship between a judge's finding that the defendant committed a separate, uncharged crime and the imposition of a substantially longer term of imprisonment does not eliminate the need for a court to safeguard a defendant's due process rights at sentencing. As Justice Stevens pointed out in his concurrence in *United States v. Rita*, 127 S. Ct. 2456 (2007), an otherwise-permissible sentence may be unreasonable if it is imposed for an impermissible reason. *See* 127 S. Ct. at 2473 (Stevens, J., concurring) ("After all, a district judge who gives harsh sentences to Yankees fans and lenient sentences to Red Sox fans would not be acting reasonably even if her procedural rulings were impeccable."). Even though judges are no longer bound to impose a sentence within the Guidelines sentencing range, they must not violate a defendant's constitutional rights by sentencing based on unconstitutional considerations.

At sentencing, a court may take into consideration facts about the offender and the offense of conviction, even if such facts also constitute elements of a separate offense. *See McMillan*, 477 U.S. at 90. However, the defendant's right to due process is implicated when it appears that a defendant is being sentenced primarily for a crime other than the crime of conviction, such as when the defendant's sentence is based predominantly on criminal conduct collateral to the crime of conviction. *See McMillan*, 477 U.S. at 88; *Kikumura*, 918 F.2d

40

at 1120 (Rosenn, J., concurring) ("[B]ecause of the extreme departure involved here for the separate offense of attempted murder, it seems evident that the Government and the sentencing judge did not consider Kikumura's attempt to kill as collateral but *primary*."); *Grier*, 475 F.3d at 573 (Rendell, J., concurring) ("The spectre of another "crime" impacting [a defendant's] sentence would be troublesome from a due process standpoint only if we were concerned that [the] sentence was in fact based predominantly on conduct wholly collateral to his convicted crime.").

The difficulty comes in determining when a court is impermissibly sentencing a defendant *primarily* for uncharged, unproven criminal conduct, rather than merely considering uncharged conduct in imposing sentence for the offense of conviction. Here, the dramatic difference between Fisher's unenhanced Guidelines sentencing range for the possession crime alone, and the sentence actually imposed, raises the possibility that the assault was given primary consideration at sentencing.

However, I concur in the judgment affirming Fisher's sentence because, based on the record before us, I do not find reason to believe that Fisher's sentence was based predominantly on the collateral criminal conduct. The District Court clearly gave consideration to all of the § 3553(a) factors at sentencing and did not place undue reliance on the uncharged assault or on the Guidelines sentencing range that factored in the uncharged assault in arriving at the sentence actually imposed. The Court stated: "Mr. Fisher, after having considered the provisions of the United States Sentencing Guidelines, the

41

advisory guideline range, the Supreme Court's ruling in *United States versus Booker*, the sentencing factors outlined in Title 18 United States Code, Section 3553, and the underlying goals of sentencing, which are many, but include punishment, deterrence, rehabilitation, respect for the law, I am sentencing you to 108 months of imprisonment." App. 160. The Court made no mention of the assault on Detective Silvers when imposing sentence. In fact, early in the sentencing hearing, the District Court noted that "this isn't purely guideline analysis anymore, counsel," in response to defense counsel's argument that omitting the stolen firearm enhancement would lower the Guidelines sentencing range. App. 151. The Court added: "I am going to look as I am permitted to, under the current state of the law, under the current standard, that the Supreme Court has said is the standard, I am going to look at all of the factors to which I am entitled to look." *Id.*

In addition, the District Court clearly understood that possession was the crime of conviction and, unlike in *Kikumura*, the enhancements to Fisher's base offense level were made pursuant to particular guidelines, rather than arrived at as part of the court's exercise of discretion to depart from the Guidelines range once the range was calculated. There is nothing in the District Court's written decision or in its remarks at sentencing that would suggest that the Court was covertly sentencing Fisher for assault rather than gun possession. Accordingly, although I do not agree with the majority's view that *Kikumura*'s concern for the "tail wagging the dog" scenario no longer has relevance post-*Booker*, I concur in the judgment affirming Fisher's sentence.